**Donna Jean ZILL a/k/a Donna Zill, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–10–00679–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 6, 2011.

Thomas A. Martin, Houston, TX, for Appellant.

Rebecca Klaren, Assistant Criminal District Attorney, Kurt Sistrunk, Criminal District Attorney, Galveston, TX, for Appellee.

Panel consists of Justices KEYES, HIGLEY, and MASSENGALE.

## OPINION

EVELYN V. KEYES, Justice.

A jury convicted appellant, Donna Jean Zill, of the third degree felony offense of driving while intoxicated—third offense, and assessed punishment at four years' confinement and a $2,000 fine.[1] In three issues, appellant contends that (1) the State failed to present sufficient evidence to show that she was intoxicated; (2) the trial court erroneously admitted testimony regarding the Vertical Gaze Nystagmus ("VGN") test; and (3) her trial counsel rendered ineffective assistance by failing either to object to the VGN testimony or to request that the trial court conduct a "gatekeeper" hearing before introduction of the VGN testimony.

We affirm.

## Background

Around 2:30 a.m. on May 23, 2009, Texas Department of Public Safety Trooper J. Petrillo was patrolling the Bacliff/San Leon area when he saw appellant driving toward him "at a high rate of speed." Trooper Petrillo confirmed by radar that appellant was driving 77 miles-per-hour in a 50 miles-per-hour speed zone. Trooper Petrillo turned around and turned on his emergency lights, which activated his in-car video camera. He acknowledged that, other than the speeding, he did not notice any other problems with appellant's driving, such as weaving between lanes or fluctuations in speed. He testified that appellant immediately and properly pulled over into a parking lot.

As Trooper Petrillo approached the driver's side window, appellant immediately handed him her ID card and then provided proof of insurance. Appellant did not provide her driver's license, but she was able to correctly recite her license number. Trooper Petrillo observed that appellant's eyes were glassy, and he testified that he noticed a "strong odor" of alcohol when he walked up to the driver's side door. Trooper Petrillo asked appellant where she was driving from, and she responded that she was coming from the San Leon Beach Pub.

Trooper Petrillo asked appellant to step out of her vehicle, and, as she did so, she "kind of held onto the door and then she swayed back toward the driver's seat before she started to walk back to the back of the patrol car." After appellant complied with Trooper Petrillo's instruction to walk to the front of his patrol car, he asked her if she had been drinking. Appellant responded that she had been drinking at the San Leon Beach Pub, and although she first stated that she had had

---

1. *See* Tex. Penal Code Ann. §§ 49.04(a), 49.09(b)(2) (Vernon 2011).

three cans of beer, she then stated that she had had four cans. Trooper Petrillo testified that appellant's speech was "mumbled and slurred" and that she was "slow to respond to questions."

Before performing the Horizontal Gaze Nystagmus ("HGN") field sobriety test, Trooper Petrillo asked appellant if she had any head injuries. Appellant did not specifically tell Trooper Petrillo that she had had a head injury, but she did state that she "had died about three years ago." Trooper Petrillo stated that he did not ask any follow-up questions because he did not feel that a potential head injury that occurred three years ago was relevant. Trooper Petrillo also stated that before beginning the HGN test, he checked for unequal pupil size and unequal tracking, both of which can indicate a head injury. According to Trooper Petrillo, appellant had equal pupil size and equal tracking. Trooper Petrillo testified that he observed six out of six clues of intoxication when he performed the HGN test. He also testified that, during the test, appellant

> had difficulty following the instructions when [asked] to keep her head still and just follow the stimulus with the eyes. She kept wanting to turn the head and move her whole head. She was staggering a little bit or unsteady on her feet, swaying. And the odor of alcohol [was] coming from her breath. And as she was talking, she was mumbling and her speech was very slurred.

Additionally, appellant mumbled and repeated "the same things over and over throughout" her encounter with Trooper Petrillo.

During Trooper Petrillo's testimony regarding appellant's performance of the HGN test, he and the prosecutor had the following exchange:

[The State]: What other nystagmus might you find in administering [the HGN]?

[Petrillo]: Well, there's numerous nystagmus. There's certain examples like caloric nystagmus or anything with vestibular, rotational, post-rotational.

[The State]: I won't get into those in detail. Will you check for vertical nystagmus?

[Petrillo]: Yes, we do.

[The State]: And why would you check for that?

[Petrillo]: Checking for vertical nystagmus would just indicate a high level of intoxication.

[The State]: Would an absence of vertical nystagmus indicate that a person's not intoxicated?

[Petrillo]: No.

[The State]: So, can a person be intoxicated and not have vertical nystagmus?

[Petrillo]: Yes.

. . . .

[The State]: When you gave the Defendant the HGN, how many clues of the test did you note?

[Petrillo]: Six clues.

[The State]: And did you note any vertical nystagmus?

[Petrillo]: No.

Defense counsel did not object to any of the references to vertical nystagmus.

Trooper Petrillo testified that he then started to administer the Walk and Turn field sobriety test to appellant. Before he finished explaining the test and before he asked appellant if she had any injuries that would impair her performance on the test, appellant improperly began the test. Trooper Petrillo asked appellant to return to the starting position, and, after he asked

whether she had any injuries, she told him that she had had her right knee replaced, that her left knee needed to be replaced, and that she also needed surgery on her shoulder. Trooper Petrillo decided not to have appellant perform the Walk and Turn and One–Leg Stand field sobriety tests because of her injuries.

Trooper Petrillo testified that by this point during the traffic stop, he had determined that appellant was intoxicated based on "the odor of alcohol, the glassy eyes, the slurred speech, the unsteady balance, and the six clues of HGN." He stated that appellant turned around and put her hands behind her back after he asked her to do so, but when he pulled out his handcuffs, she started to walk away toward the passenger compartment of her truck and told him "no." Appellant was "visibly upset," yelled obscenities, and told Trooper Petrillo that he "was going to have to shoot her." She continued to yell obscenities and act belligerent after Trooper Petrillo handcuffed her and placed her in the front seat of his patrol car. Appellant refused to submit to either a breath or blood sample.[2]

On cross-examination, Trooper Petrillo acknowledged that he did not include in his offense report any "good" driving facts that suggested that appellant had use of her mental faculties—i.e., that she appropriately used her turn signal and immediately pulled over after seeing Petrillo's emergency lights. He also acknowledged that he did not include in his offense report any information about appellant stumbling after getting out of her truck or having general problems with her balance and coordination. Trooper Petrillo agreed with defense counsel that appellant informed him that she had to open the driver's side door by using the outside handle, but he further testified that she stumbled back toward the driver's seat and had to use the door handle for support after she had already gotten out of her truck. He further agreed that appellant "candid[ly]" told him how many beers she had had that evening, and he acknowledged that he did not ask her when in the evening she had consumed those beers.

Trooper Petrillo testified that appellant giggled throughout the traffic stop and that this behavior "caught [his] attention," but he believed that this behavior was the result of intoxication and, therefore, he did not ask her any questions about possible brain damage. He agreed that appellant's response to his question about whether she had any head injuries was unusual, and he confirmed that he did not ask her any follow-up questions to determine if a head injury was the cause of her behavior. Trooper Petrillo further agreed that appellant's behavior—such as her giggling and repetition of statements—could be a side effect of a brain injury.

Defense counsel also asked Trooper Petrillo the following questions about vertical nystagmus on cross examination:

[Defense]: And you testified that the vertical nystagmus is done to decide whether there's a high level of intoxication in a person, correct?

[Petrillo]: Correct.

[Defense]: And you did this. You performed this test on Ms. Zill and it wasn't there, correct?

[Petrillo]: Correct.

Trooper Petrillo also testified that he was eventually able to evaluate appellant on the HGN test, but he had to repeat his instruction not to move her head several times. He further testified that when ap-

---

**2.** The trial court admitted a redacted DVD recording of the entire traffic stop, which included appellant's refusal to submit a blood or breath sample.

pellant attempted the Walk and Turn test, she did not have a problem with her balance, but she did exhibit two clues: she did not walk heel to toe in a straight line and she did not wait for him to finish the instructions.

After the trial court admitted appellant's medical records, defense counsel recalled Trooper Petrillo and asked him several questions about the contents of those records. The records reflected that appellant suffered a head injury in 1987—twenty-two years before the events of this case—and she was combative and belligerent, used abusive language and inappropriate words, had a short attention span, and was "responding and doing things that made no sense" while at the hospital after her injury. Trooper Petrillo agreed that appellant exhibited similar behavior when he stopped her.

Appellant called Connie Byrum, the manager of the San Leon Beach Pub, where appellant worked as a bartender, to testify on her behalf. Byrum testified that on May 22, 2009, appellant's shift ended at 7:00 p.m. After appellant finished working, she stayed at the bar and Byrum served her a beer. After the pub started getting busy, Byrum asked appellant if she could help stock and serve drinks. She stated that she served appellant a second beer around 1:30 a.m., when the crowd at the pub began to ease, and that no one else could have served appellant any drinks because Byrum was the only one tending bar that night. Byrum testified that appellant appeared tired, but she did not think that appellant was intoxicated when she left the pub to go home.

Byrum testified that she was aware that appellant had suffered a brain injury in the past and that appellant would mumble and talk to herself as a result. She also stated that appellant would "get angry and use vulgar language" when she was frustrated.

On cross-examination, Byrum agreed that she was busy with other customers and therefore was not aware of appellant's actions "every minute of the night." To Byrum's knowledge, appellant had only two beers that evening. Byrum testified that when appellant is intoxicated, she giggles to herself, slurs her words, repeats herself, and has glassy eyes.[3]

Appellant testified on her own behalf. She stated that since her head injury in 1987, which occurred when she either jumped or fell from a moving truck, she does not handle stress well and often rambles and rants without being able to control what she is saying. She further testified that she had two additional prior head injuries: (1) she was hit in the head with an unknown object around eight to ten years before trial and (2) she was hit on the head with a pool stick on September 1, 2008. The trial court admitted medical records relating to the 1987 injury, but not to the two subsequent injuries.

Appellant arrived at work on May 22, 2009, at 11:45 a.m. and worked a seven-hour shift. She testified that she had her first beer around 7:30 that evening, after she had finished her shift, and a second beer, both of which were served by Byrum, after 1:00 a.m. She further testified that a customer bought her a third beer around 1:30 a.m., which she sipped, and another customer bought her a fourth beer at closing time, but she did not drink that beer. Appellant stated that she told Trooper Petrillo about the fourth drink, even though she did not drink it, "to be totally honest"

3. On redirect examination, Byrum testified that appellant generally giggles and laughs to herself, even when she has not been drinking.

and that he did not give her a chance to explain that she did not actually drink it.

Appellant testified that when Trooper Petrillo approached her door, she was looking for her current insurance policy and that is why she did not immediately respond to his question asking where she was coming from. She also testified that she did not wait for Trooper Petrillo to finish the instructions for the Walk and Turn test because she did not believe that he was going to "articulate [the instructions] to that extent," and she wanted to get the test over with because she was not intoxicated. Appellant stated that she was frustrated and "feeling a lot of stress," which is why she told Trooper Petrillo to "just shoot [her]" when he prepared to handcuff her. She further testified that she did not feel safe sitting in the front seat of the patrol car, and she was not able to control her emotions and her behavior at that time. She stated that she was talking and giggling to herself because she was under stress, not because she was intoxicated.

On cross-examination, appellant described her previous head injuries and stated that she had only discovered the extent of her injuries approximately one month before the trial. Appellant agreed that her trial was more stressful than the traffic stop and that she had been able to control her emotional responses and behavior while in the courtroom. She also agreed with the State that the medical records following her 1987 injury did not

state that her "combative behavior and abusive language was a result of [her] accident." [4]

Appellant further agreed that, based on her experience as a bartender, she can detect when someone is intoxicated. She agreed that slurring words, attempting to get into arguments, stumbling and swaying, red, bloodshot, or glassy eyes, the odor of alcohol, admitting to having a few drinks, slowly responding to questions, continuous giggling, and inability to follow directions are all signs of intoxication. She also agreed that some people might not be aware that they are intoxicated and that "their perception of their own condition may be [a] little altered."

Appellant stipulated that she had two prior convictions for operating a motor vehicle while intoxicated. The jury found appellant guilty of the offense of driving while intoxicated—third offense, and assessed punishment at four years' confinement and a $2,000 fine. Appellant moved for a new trial; however, she argued only that the verdict was contrary to the law and the evidence. She did not argue that her trial counsel rendered ineffective assistance.

## Sufficiency of the Evidence

In her first issue, appellant contends that the State failed to present legally and factually sufficient evidence that she was intoxicated.[5]

4. For example, the "History and Physical Examination" section of appellant's medical records states: "[Patient] is restrained and combative. She is using abusive language and inappropriate words." The only medical records admitted were from appellant's six-day hospital stay following the 1987 injury. There are no medical records documenting whether appellant's combative behavior and abusive language persisted after her discharge from the hospital.

5. In *Brooks v. State,* the Court of Criminal Appeals overruled *Clewis v. State* and its progeny and held that evidence is to be reviewed solely under the sufficiency standard described in *Jackson v. Virginia.* 323 S.W.3d 893, 912 (Tex.Crim.App.2010) ("[W]e decide that the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element ... beyond a reasonable doubt."); *Ervin v. State,* 331

## A. Standard of Review

 When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim.App.2010). The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks,* 323 S.W.3d at 899; *Bartlett v. State,* 270 S.W.3d 147, 150 (Tex.Crim.App.2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Margraves v. State,* 34 S.W.3d 912, 919 (Tex.Crim.App.2000), *overruled on other grounds, Laster v. State,* 275 S.W.3d 512 (Tex.Crim.App. 2009); *see also Henderson v. State,* 29 S.W.3d 616, 623 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd) (holding jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007). We afford almost complete deference to the jury's determinations of credibility. *See Lancon v. State,* 253 S.W.3d 699, 705 (Tex.Crim.App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex.Crim. App.2000); *see also Clayton v. State,* 235 S.W.3d 772, 778 (Tex.Crim.App.2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

## B. Driving While Intoxicated—Third Offense

To establish that appellant committed the offense of driving while intoxicated—third offense, the State was required to prove that appellant was "intoxicated while operating a motor vehicle in a public place" and that appellant had been previously convicted "two times of any other offense relating to the operating of a motor vehicle while intoxicated...." TEX. PENAL CODE ANN. §§ 49.04(a), 49.09(b)(2) (Vernon 2011). A person is intoxicated if she does not have "the normal use of mental or physical faculties by reason of the introduction of alcohol ... into the body." *Id.* § 49.01(2)(A) (Vernon 2011).

 The Court of Criminal Appeals has identified several characteristics that constitute evidence of intoxication, including slurred speech, bloodshot or glassy eyes, unsteady balance, a "staggering gait," and the odor of alcohol on the person or on her breath. *See Cotton v. State,* 686 S.W.2d 140, 142–43 & 142 n. 3 (Tex.Crim.App. 1985); *see also Kirsch v. State,* 306 S.W.3d 738, 745 (Tex.Crim.App.2010) ("Other evidence that would logically raise an inference that the defendant was intoxicated ... includes, *inter alia,* erratic driving, post-driving behavior such as stumbling, swaying, slurring or mumbling words, inability to perform field sobriety tests or follow directions, bloodshot eyes, [and] any admissions by the defendant concerning what, when, and how much he had been drinking...."). The testimony of a police officer regarding the defendant's behavior and the officer's opinion that the defendant is intoxicated provides sufficient support to

S.W.3d 49, 52–54 (Tex.App.-Houston [1st Dist.] 2010, pet. ref'd) (construing majority holding in *Brooks* ).

uphold a jury verdict. *See Annis v. State,* 578 S.W.2d 406, 407 (Tex.Crim.App.1979) (holding arresting officer's testimony regarding his observations of defendant's driving, physical appearance, post-driving behavior, and his conclusion of intoxication sufficient); *Whisenant v. State,* 557 S.W.2d 102, 105 (Tex.Crim.App.1977) (holding same when officer testified that defendant drove erratically, had strong smell of alcohol on breath, appeared sleepy, slurred words, and admitted to drinking and officer concluded defendant was intoxicated); *Henderson,* 29 S.W.3d at 622 ("The testimony of a police officer that an individual is intoxicated is probative evidence of intoxication.").

■ A defendant's poor performance on the standardized field sobriety tests is further evidence of intoxication. *See Finley v. State,* 809 S.W.2d 909, 913 (Tex.App.-Houston [14th Dist.] 1991, pet. ref'd) ("Texas courts consistently uphold DWI convictions based upon the opinion testimony of police officers who observed the defendant's unsatisfactory performance in field sobriety tests."); *see also Kirsch,* 306 S.W.3d at 745 (listing "inability to perform field sobriety tests or follow directions" as evidence that raises inference of intoxication). The jury may also consider the defendant's refusal to submit a blood or breath specimen as evidence of intoxication. *See* Tex. Transp. Code Ann. § 724.061 (Vernon 2011); *Bartlett,* 270 S.W.3d at 153 ("Evidence of the appellant's refusal to submit to a breath test is relevant for precisely the reason that the trial court identified in the contested jury instruction, namely, that it tends to show a consciousness of guilt on his part."); *Russell v. State,* 290 S.W.3d 387, 397 (Tex. App.-Beaumont 2009, no pet.) ("In addition, the jury in this case could have inferred from Russell's refusal to take a breath test that Russell believed he was

intoxicated."). Additionally, "[s]peeding can indicate impaired mental judgment and, therefore, is a factor to be considered . . . ." *Tex. Dep't of Pub. Safety v. Gilfeather,* 293 S.W.3d 875, 880 (Tex.App.-Fort Worth 2009, no pet.) (considering speeding as factor in determining whether officer had probable cause to arrest for driving while intoxicated); *Arthur v. State,* 216 S.W.3d 50, 55 (Tex.App.-Fort Worth 2007, no pet.) (holding that speeding is factor to be considered in determining whether officer had reasonable suspicion to detain for field sobriety tests).

■ Here, Trooper Petrillo testified that his radar confirmed that appellant was driving 77 miles-per-hour in a 50 miles-per-hour speed zone. Trooper Petrillo noticed a "strong odor" of alcohol when he walked up to the driver's side door, and he testified that throughout the traffic stop appellant's eyes were glassy, her speech was slurred, her breath smelled of alcohol, she mumbled and giggled to herself, she was slow to respond to questions, and she became belligerent. Appellant admitted to him that she had had four beers on the evening of the traffic stop. Trooper Petrillo further testified that appellant "swayed" after getting out of her truck and during the HGN test. Trooper Petrillo also stated that appellant exhibited six out of six clues on the HGN test and that he had to tell her several times to keep her head still during the test. Although Trooper Petrillo did not have appellant complete the Walk and Turn test due to her knee injuries, he testified that she exhibited two clues—failure to walk heel to toe in a straight line and failure to follow instructions—before he ended the test. Trooper Petrillo testified that, in his opinion, appellant was intoxicated and that he based this opinion on "the odor of alcohol, the glassy eyes, the slurred speech, the unsteady balance, and the six clues of

HGN." Appellant also refused to submit to either a blood or breath sample.

Appellant contends that her conduct and behavior was a result of her 1987 head injury and not intoxication. Appellant's medical records indicate that while she was in the hospital after this injury she was "combative and abusive" and that she had problems with her attention span. Appellant and Connie Byrum, appellant's manager at the San Leon Beach Pub, both testified that appellant commonly mumbles and giggles and talks to herself as a result of her prior head injury. Appellant further testified that she "rants and raves" when she is under stress. Appellant and Byrum also both testified that appellant was merely tired and was not intoxicated when she left the pub.

It is the province of the jury to decide conflicts in the evidence, and, in a sufficiency of the evidence review, we will not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the jury. *See Williams*, 235 S.W.3d at 750; *see also Lancon*, 253 S.W.3d at 705 (providing that we afford almost complete deference to jury determinations of credibility). We resolve all inconsistencies in the evidence in favor of the verdict. *Curry*, 30 S.W.3d at 406; *see also Clayton*, 235 S.W.3d at 778. Furthermore, even when there is no conflict in the evidence, "the jury may give no weight to some evidence, and thereby reject part or all of a witness' testimony." *Kimball v. State*, 24 S.W.3d 555, 561 (Tex.App.-Waco 2000, no pet.); *see also Henderson*, 29 S.W.3d at 623 (holding that jury may dis-

believe witness even when testimony is uncontradicted).

Although appellant's behavior during the traffic stop may have been consistent with a head injury, her behavior also constitutes recognized evidence of intoxication. *See, e.g., Kirsch*, 306 S.W.3d at 745. The jury was fully entitled to believe Trooper Petrillo's testimony that appellant was intoxicated and disbelieve appellant's alternative explanation that her prior head injuries caused her behavior. *See Russell*, 290 S.W.3d at 396–98 (holding evidence sufficient to support intoxication finding despite appellant's contention that his behavior and symptoms were caused by hypoglycemia and diabetes). The jury was also entitled to disbelieve Byrum's testimony that appellant was tired and not intoxicated and appellant's testimony that, although she told Trooper Petrillo that she had had four drinks, she only drank two of those drinks.

As further indications that the State did not present sufficient evidence, appellant points to (1) Trooper Petrillo's acknowledgment that his initial offense report did not include any information about appellant's swaying, stumbling, or having balance problems; (2) appellant's own testimony that she did not have trouble getting out of her truck and that her truck door only opened a certain way and thus she had to "side step" when getting out of her truck; and (3) the video of the traffic stop, which she contends shows her walking steadily with no balance problems when she attempted the Walk and Turn test.[6]

---

**6.** As further evidence that she was not intoxicated, appellant also points to her "good" driving facts: she immediately pulled over after seeing Trooper Petrillo's emergency lights, she appropriately used her turn signal, and she stopped in a safe and well-lit parking lot. In a sufficiency of the evidence review, however, we consider all of the evidence, and

the totality of the evidence may be sufficient to support a finding of intoxication even though the arresting officer admits that the defendant's driving "was not necessarily indicative of intoxication." *Hennessy v. State*, 268 S.W.3d 153, 158 (Tex.App.-Waco 2008, pet. ref'd).

The trial court admitted a redacted version of the video of the traffic stop. This video began when Trooper Petrillo turned on his emergency lights. It contained appellant's field sobriety tests, her behavior in Petrillo's patrol car, and her refusal to submit a blood or breath sample. Thus, the jury was able to view the video recording and determine for itself what physical characteristics—such as swaying or stumbling—appellant displayed during the traffic stop and whether appellant's behavior appeared to be the result of her prior head injuries or intoxication. *See id.* at 397 ("[B]ecause the jury saw the videotape of the stop, it could draw its own conclusions from observing Russell's behavior in deciding whether he appeared intoxicated.").

Viewing all of the evidence in the light most favorable to the jury's verdict, we hold that the evidence was sufficient for a rational fact finder to have found beyond a reasonable doubt that appellant was intoxicated at the time she was stopped by Trooper Petrillo.

We overrule appellant's first issue.

### Admission of VGN Testimony

In her second issue, appellant contends that the trial court erred in admitting testimony from Trooper Petrillo regarding the VGN test. Although appellant acknowledges that her trial counsel did not object to this testimony, she contends that the admission of this testimony constitutes "plain error." [7]

Generally, to preserve error for appellate review, the appellant must make a timely request, objection, or motion that states the grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint. Tex.R.App.

P. 33.1(a)(1)(A); *Layton v. State*, 280 S.W.3d 235, 238–39 (Tex.Crim.App.2009). The Court of Criminal Appeals has recognized, however, that an appellant may raise for the first time on appeal claims that certain "fundamental" rights were violated. *Saldano v. State*, 70 S.W.3d 873, 887 (Tex.Crim.App.2002); *see also Marin v. State*, 851 S.W.2d 275, 279 (Tex.Crim.App.1993) ("All but the most fundamental rights are thought to be forfeited if not insisted upon by the party to whom they belong. Many constitutional rights fall into this category."), *overruled on other grounds, Cain v. State*, 947 S.W.2d 262 (Tex.Crim.App.1997). In *Saldano*, the court noted that the general error preservation requirement does not apply to "two relatively small categories of errors: violations of 'rights which are waivable only' and denials of 'absolute systemic requirements.' Such errors may be raised for the first time on appeal." 70 S.W.3d at 888 (quoting *Marin*, 851 S.W.2d at 280); *see also Marin*, 851 S.W.2d at 279 (listing right to assistance of counsel and right to jury trial as examples of "rights which are waivable only" and laws affecting jurisdiction of trial court as examples of "absolute systemic requirements").

In *Saldano*, the Court of Criminal Appeals addressed whether the appellant was required to object at trial to evidence that potentially violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment as a prerequisite to appellate review of the issue. 70 S.W.3d at 889. The court observed that it had "consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitu-

---

7. "The traditional term in Texas' criminal law that corresponds to 'plain error' is 'fundamental error.'" *Jimenez v. State*, 32 S.W.3d 233, 238 (Tex.Crim.App.2000). In addressing this issue, we refer to "fundamental error" and not "plain error."

tional right of the defendant." *Id.* Thus, the court held that "[b]ecause the appellant did not object to the admission of the testimony of which he now complains, the question he seeks to present has not been preserved for review on appeal." *Id.* at 890; *see also Marin,* 851 S.W.2d at 280 ("[A]n important consequence of a party's failure to petition enforcement of his forfeitable rights in the trial court is that no error attends failure to enforce them and none is presented for review on appeal.").

Appellant cites the Tyler Court of Appeals' decision in *Stovall v. State,* 140 S.W.3d 712 (Tex.App.-Tyler 2004, no pet.), and the Fourteenth Court of Appeals' decision in *Quinney v. State,* 99 S.W.3d 853 (Tex.App.-Houston [14th Dist.] 2003, no pet.), for the proposition that the trial court erroneously admitted Trooper Petrillo's testimony regarding VGN and that this action constitutes fundamental error. In *Stovall,* the Tyler court held that the State bears "the burden of producing evidence of the underlying scientific theory behind the expert testimony" regarding VGN and that the trial court erred in refusing to conduct a *Daubert/Kelly* "gatekeeper" hearing on the reliability of VGN tests. *See* 140 S.W.3d at 717, 718. Similarly, in *Quinney,* the Fourteenth court held that the State, as the proponent of VGN evidence, bears the burden of "present[ing] evidence of . . . the scientific theory underlying [that] test." *See* 99 S.W.3d at 859–60 (holding erroneous admission of VGN evidence without demon-

stration of its reliability harmless in light of strong evidence of intoxication). Although both of these cases support the proposition that admission of VGN evidence without first proving the reliability of the test is error, they do not support the proposition that such admission is *fundamental* error and thus may be raised for the first time on appeal.[8]

 If a defendant fails to object at trial to the admission of evidence, she fails to preserve her complaint about that evidence for appellate review, even if the erroneous admission implicates a constitutional right. *See Saldano,* 70 S.W.3d at 889. Appellant cites no authority for the proposition that testimony regarding the VGN test should be an exception to this general rule and should be considered "fundamental" error, which may be raised for the first time on appeal. *See Marin,* 851 S.W.2d at 279 ("[C]ertain, *relatively few,* rights must be protected by the system's impartial representatives unless expressly waived by the party to whom they belong.") (emphasis added). We therefore conclude that a defendant must object in the trial court to the admission of VGN evidence to preserve her complaint for appellate review. Because appellant's trial counsel admittedly did not object to Trooper Petrillo's testimony regarding the VGN test, we hold that appellant has not preserved her complaint that the trial court erroneously admitted VGN evidence with-

---

8. In an unpublished memorandum opinion, the Austin Court of Appeals held that the appellant failed to preserve his complaint that the trial court erroneously admitted VGN testimony because the appellant "first adduced testimony regarding [his] lack of VGN and what that indicated" during cross-examination of the arresting officer and did not object to the State's later questions regarding VGN "and its significance." *Guardiola v. State,* No. 03-08-00399-CR, 2010 WL 1170204, at

*5 (Tex.App.-Austin Mar. 23, 2010, no pet.) (mem. op., not designated for publication); *see also Richards v. State,* No. 09-04-488-CR, 2006 WL 61939, at *1 (Tex.App.-Beaumont Jan. 11, 2006, no pet.) (mem. op., not designated for publication) (distinguishing *Stovall* because "[i]n this case, Richards admits he failed to object at trial to the testimony complained of on appeal. Error may not be predicated on a ruling that admits evidence unless a timely objection appears on the record").

out requiring a showing of the test's reliability.

We overrule appellant's second issue.

### Ineffective Assistance of Counsel

In her third issue, appellant contends that her trial counsel rendered ineffective assistance by failing either to object to the introduction of VGN testimony or to request that the trial court conduct a "gatekeeper" hearing before the introduction of such testimony.

■ To prevail on an ineffective assistance of counsel claim, the appellant must demonstrate, by a preponderance of the evidence, (1) that her trial counsel's performance was deficient and (2) that a reasonable probability exists that, but for the deficiency, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). The appellant must first show that her counsel's performance fell below an objective standard of reasonableness, which does not require showing that counsel's representation was without error. *Robertson v. State,* 187 S.W.3d 475, 483 (Tex.Crim.App.2006). The second prong of *Strickland* requires the appellant to demonstrate prejudice—a reasonable probability that, but for her counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Thompson v. State,* 9 S.W.3d 808, 812 (Tex.Crim.App.1999). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. We indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and therefore the appellant must overcome the presumption that the challenged action constituted

"sound trial strategy." *Id.* at 689, 104 S.Ct. at 2065; *Williams v. State,* 301 S.W.3d 675, 687 (Tex.Crim.App.2009). "Failure of appellant to make either of the required showings of deficient performance and sufficient prejudice defeats the claim of ineffective assistance." *Rylander v. State,* 101 S.W.3d 107, 110 (Tex. Crim.App.2003); *see also Williams,* 301 S.W.3d at 687 ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

■ Both the Tyler Court of Appeals and the Fourteenth Court of Appeals have held that the State must present evidence of the reliability of, and the scientific theory underlying, the VGN test and that the trial court errs in admitting such evidence in the absence of this showing. *See Stovall,* 140 S.W.3d at 717; *Quinney,* 99 S.W.3d at 859. In both *Stovall* and *Quinney,* the State presented evidence that the officer performing the sobriety tests observed vertical nystagmus. *See Stovall,* 140 S.W.3d at 716; *Quinney,* 99 S.W.3d at 856. Here, in contrast, Trooper Petrillo explicitly testified, on both direct and cross examination, that appellant did not demonstrate vertical nystagmus.

Moreover, although appellant contends that trial counsel should have objected to Trooper Petrillo's " 'expert' conclusion that the absence of VGN does not necessarily equate to the absence of intoxication," the State presented sufficient evidence apart from Trooper Petrillo's VGN testimony to support the jury's conclusion that appellant was intoxicated. *See Quinney,* 99 S.W.3d at 859–60 (holding that trial court erroneously admitted VGN testimony when State did not present evidence of test's reliability, but concluding that error was harmless in light of strong evidence of intoxication). We conclude that appellant has not established, by a preponderance of

the evidence, that a reasonable probability exists that but for trial counsel's allegedly deficient performance the result of the trial would have been different.

We therefore hold that appellant has not demonstrated that her trial counsel rendered ineffective assistance.

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.