# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00363-CR

---

**Jordan Stephens, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 2 OF BELL COUNTY**
**NO. 23CCR03391, THE HONORABLE JOHN MICHAEL MISCHTIAN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Jordan Stephens guilty of misdemeanor driving while intoxicated (DWI). *See* Tex. Penal Code § 49.04(a). The trial court sentenced him to 120 days in jail and a $1,000 fine, suspended his sentence, and placed him on community supervision for a period of eighteen months. In a single issue on appeal, Stephens challenges the sufficiency of the evidence proving that he was intoxicated while driving. Because we conclude that the evidence was sufficient, we affirm the trial court's judgment of conviction.

## BACKGROUND

At 2:55 a.m. on May 26, 2023, Kimberly Thomas called 911 to report a reckless driver in front of her on I-35 in Bell County. She followed the driver, later identified as Stephens, until he was pulled over by police. Belton Police Department Officer Christopher Carter, assisted

by Officer Brian Pedraza, administered standardized field sobriety tests (SFSTs) and arrested Stephens for DWI.

Both officers testified at trial. The State's exhibits included a recording of Thomas's 911 call, Officer Carter's and Officer Pedraza's body-cam videos, and Officer Carter's dash-cam video. Stephens, who at the time of the offense was an officer with the Jarrell Police Department, presented testimony from his friend, JPD Officer Micah Underwood.[1]

In her 911 call, Thomas described Stephens's truck and provided its license plate number. For over ten minutes, she followed him from "a good distance" and narrated his dangerous driving. He was unable to maintain one lane "at all"; drove in the shoulder and "in the middle of two lanes"; and was "literally just back and forth," swerving from the shoulder to the concrete barricade dividing the northbound and southbound lanes and back. He almost struck the barricade and later "just about swerved [a semi-truck] off the road." She explained, "When I say it's erratic, I'm not talking like there's a little, he crossed over a line—like he's completely moving out of lanes almost hitting vehicles."

Thomas's testimony corroborated her account to the 911 dispatcher. She had observed Stephens's reckless driving for a mile or two before calling 911, which she did only after realizing that he appeared to be more than "just a possible distracted driver." She did not "report every single time that he crossed out of the lanes" but related only his "very erratic" maneuvers. Although she had not mentioned it on the 911 call, he "wasn't consistently going one speed. He would go from 75 miles an hour to 40 miles an hour. It was so erratic." She did not see the truck's driver but was confident that police pulled over "the vehicle [she] observed driving erratically."

---

[1] At the time of trial, Stephens was no longer employed by JPD. The circumstances of his leaving the department are unclear from the record.

2

Officer Carter, who at the time of the offense had been a police officer for a little over a year and had conducted around thirty SFSTs, testified about his DWI investigation. He had learned to conduct SFSTs at the academy, from his field training, and by observing other officers. He was aware that officers are supposed to follow "a certain script" when conducting SFSTs.

Officer Carter pulled Stephens over after "pacing" his truck by following it while going the speed limit and noticing that Stephens was gaining distance on him. Using the speed at which the gap between their vehicles remained constant, Officer Carter determined that Stephens was going ten miles per hour above the speed limit. After Officer Carter activated his overhead lights, Stephens pulled over quickly and while using his turn signal.

Officer Carter approached the passenger's side of Stephens's truck. "[A]t the very beginning of the traffic stop, [Stephens] mentioned that he was a police officer." In response to Officer Carter's questions, Stephens stated that he was coming from Georgetown and had something to drink; while he initially said that he had "a couple" of drinks, he later admitted to having three. Officer Carter smelled the odor of alcohol on Stephens's breath and noted that he had "glossy" eyes, by which Carter meant "glassy, watery . . . . Like redness[]." Officer Carter agreed that glossy eyes could result from tiredness or allergies.

Based on his observations and on the 911 call, Officer Carter decided to administer SFSTs on the shoulder of I-35. SFSTs may show that a driver is "not in complete control of his . . . reactions at the time, his balance, his mental faculties are [not] all there anymore." Although the shoulder was not "perfectly level," it was not sloped to such a degree that it could cause someone undergoing SFSTs to commit an error. Officer Carter testified that it was not a windy night but that passing vehicles could have caused a distraction or "breezes" and could potentially have led to mistakes in the tests.

3

Officer Carter conducted three SFSTs: the horizontal-gaze nystagmus test (HGN), walk-and-turn, and one-leg stand. In conducting the HGN, he had Stephens follow a pen with his eyes. Officer Carter observed four out of six possible clues of intoxication, including Stephens's eyes "jerking" all the way across. Stephens exhibited three of eight possible clues when performing the walk-and-turn: he failed to step heel-to-toe; stepped off the line; and turned improperly, causing him to lose his balance. Officer Carter observed three of four clues on Stephens's one-leg stand, which he testified was "one of the worst one-leg stands I've ever seen." Stephens swayed, put his foot down, and hopped so much that Officer Carter feared he would knock Officer Pedraza—who was standing between Stephens and the road—into oncoming traffic. Notably, Stephens hopped against the shoulder's downward gradient.

Officer Carter acknowledged that he deviated from the standard script "slightly" and made a few mistakes and omissions when instructing Stephens on the SFSTs. However, Officer Carter testified that the errors did not directly pertain to the observed clues, that the omitted instructions did not "in any way make it more difficult for [him] to assess intoxication," that he "didn't leave out anything extreme," and that "the basis of the instructions and how to perform [the SFSTs] was the same." He explained that he omitted certain instructions and did not ask Stephens certain questions to determine his eligibility to take the SFSTs because he was trying to "get off the road on I-35 with cars passing by" and because, as a police officer, Stephens would have been familiar with the instructions and could not have suffered from the health conditions for which the qualifying questions screened.

From having seen "more signs of intoxication" from Stephens's performance on the SFSTs, Officer Carter concluded that Stephens's blood-alcohol content "was probably above .08" and that "his driving was impaired regardless." He arrested Stephens for DWI. After initially

4

denying that he had any firearms in his truck, Stephens told Officer Carter that there was a shotgun in the backseat. Stephens refused to provide a blood sample, and Officer Carter did not ask for a breath sample because he believed that "blood is more accurate" and "can show other things other than alcohol." He testified that he had no reason, however, to suspect that Stephens had consumed anything other than alcohol. No blood sample was ultimately obtained or tested.

Officer Pedraza, who like Officer Carter had been trained to conduct SFSTs, testified about his observations during the investigation and about his search of Stephens's truck. Officer Pedraza was positioned on the driver's side of the truck and smelled an alcoholic odor coming from it. He too listed clues exhibited by Stephens during the SFSTs. Stephens swayed and moved his head "quite a bit" while doing the HGN. During the walk-and-turn, he stepped off the line and turned improperly, taking a "wide step" and losing his balance. While standing on one leg, he "used [his] arms for balance, hopped, swayed, and put his foot down." He in fact swayed so much that he almost backed into Officer Pedraza and fell onto the highway.

Officer Pedraza testified that poor performance on SFSTs demonstrates a "lack of mental and physical faculties" and that Stephens was "unable to control his body himself at that time." However, Officer Pedraza also testified that "[i]t could be difficult" to remember the instructions "[w]hen one is on the side of the road, [it is] three in the morning, and there's trucks going by between 60 and probably 80 miles an hour" and that he would have conducted the tests differently from Officer Carter, who did not fully follow their training and procedure.

During an inventory search of Stephens's truck, Officer Pedraza found two Smirnoff Ice bottles and "fresh liquid" on rubber mats on the rear passenger's side floorboard. From the bottles' position, he believed that they "w[ere] probably thrown back there or were back

5

there right before the stop happened." Although he remembered at least two Smirnoff Ice bottles, Officer Pedraza testified that he found "several" empty bottles in the truck.

During the defense's case-in-chief, Officer Underwood testified that although Stephens had been his training officer and partner and was his friend, Underwood was going to offer the jury only "unbiased" testimony about the administration of SFSTs and an accurate account of what he observed on the body- and dash-cam videos. At the time of trial, Officer Underwood had received specialized training in SFSTs, had conducted around thirty, and had made ten or fifteen DWI arrests. He testified that failure to conduct SFSTs correctly could reduce their accuracy.

First, Officer Underwood did not think that Officer Carter paced Stephens or that there was any way Officer Carter could have determined his speed. Stephens pulled over using his turn signal, which was inconsistent with his being intoxicated, and his speech was normal and offered no indication that he had lost his mental faculties.

Second, Officer Underwood testified about Officer Carter's mistakes when conducting the SFSTs. Prior to the HGN, Officer Carter failed to check Stephens's eyes for equal tracking and did not ask whether he wears contacts or has a medical condition. With respect to the walk-and-turn, Officer Carter neglected to ask whether Stephens was over sixty-five years old or was overweight, demonstrated only three steps but did not tell Stephens he would need to take nine, placed his feet incorrectly and failed to count his steps during the demonstration, and did not instruct Stephens to wait to begin the test until he was told. When instructing Stephens for the one-leg stand, Officer Carter failed to tell him to keep his foot parallel to the ground, a "relatively minor" but required instruction, and to keep his legs straight; Officer Underwood noticed that Stephens bent his legs during the test, which may have "caused some balance issues for him."

6

Because Officer Carter incorrectly administered the tests, Officer Underwood could not definitively say whether Stephens was intoxicated.

On cross-examination, Officer Underwood agreed that Stephens knew how to conduct SFSTs and had trained others how to do so. Similarly, Stephens had both administered SFSTs and made DWI arrests, although Officer Underwood did not know when Stephens last did either. Officer Underwood also agreed that he did not know Stephens to have a condition that would disqualify him from being eligible for the HGN, that Stephens could not have been a police officer if he had such a condition, that it was obvious that he was under sixty-five and not obese, and that he did not appear to have mobility issues. Officer Underwood further agreed that Stephens's hopping during the one-leg stand was not "exactly indicative of the SFSTs being improperly administered." Officer Underwood recognized that Stephens had exhibited various clues during the SFSTs; acknowledged that Officers Carter and Pedraza were in a "better position to tell this jury what they saw and heard and smelled and observed"; and when told of Officer Carter's and Officer Pedraza's observations, testified, "If I had personally observed all those things and he had all the observable clues during the HGN, that many observable clues in the walk-and-turn and the one-leg stand, I would have placed him under arrest." While Officer Underwood agreed that Stephens could have "cleared all this up" by providing a blood sample, he testified that that the refusal to provide a sample is not evidence of intoxication because every person has the right to refuse so as not to self-incriminate.

After hearing the evidence, the jury found Stephens guilty of DWI. This appeal followed.

## DISCUSSION

### I. Sufficiency of the Evidence

Stephens contends that the "evidence produced during [his] trial was legally insufficient to show that he was intoxicated at the time he was driving his vehicle." He emphasizes evidence that he was not intoxicated, including Officer Carter's testimony that tiredness or allergies could cause glossy eyes and Stephens's using his turn signal when promptly pulling over. He asserts that because Officer Carter admitted to making mistakes when administering the SFSTs, "a rational finder of fact could not rely on any of the evidence derived from the administration of the SFSTs." And he argues that there was no evidence of a temporal link between his driving and any intoxication.

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We measure the sufficiency of the evidence against the hypothetically correct jury charge. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

In conducting our review, we evaluate all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). "Circumstantial evidence is as probative as direct

8

evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). We presume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Our concern is whether the factfinder reached a rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "'is restricted to guarding against the rare occurrence when a fact finder does not act rationally'" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))).

The trier of fact is the sole judge of the weight and credibility of the evidence. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *see* Tex. Code Crim. Proc. art. 36.13 (explaining that "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Arroyo*, 559 S.W.3d at 487. When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *see Musacchio v. United States*, 577 U.S. 237, 243 (2016) (reaffirming that appellate sufficiency review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)). We must "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). The factfinder may rely on common sense and

9

apply observation and experience gained in ordinary affairs when drawing inferences from the evidence. *Acosta*, 429 S.W.3d at 625.

Because Stephens limits his sufficiency challenge to the evidence of intoxication, we will confine our analysis to that element of the offense. A person commits the offense of DWI if he is "intoxicated while operating a motor vehicle in a public place." Tex. Penal Code § 49.04(a). Intoxicated means

> (A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body; or
>
> (B) having an alcohol concentration of 0.08 or more.

*Id.* § 49.01(2). "The first definition is the 'impairment' theory, while the second is the 'per se' theory." *Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010). Only the impairment theory is applicable in this case.

Evidence of intoxication includes any signs that a person's physical or mental abilities are diminished; impaired driving behavior such as driving erratically or not following the rules of the road; post-driving behavior such as stumbling, swaying, slurring or mumbling words, and an inability to perform field sobriety tests or follow directions; physical signs of intoxication such as bloodshot eyes or an odor of alcohol; any admissions by the defendant regarding the substances that he has consumed; and a refusal to submit to breath or blood testing, which can indicate a consciousness of guilt. *See id.* at 745; *Bartlett v. State*, 270 S.W.3d 147, 153 (Tex. Crim. App. 2008); *Cotton v. State*, 686 S.W.2d 140, 142 n.3 (Tex. Crim. App. 1985); *see also Finley v. State*, 809 S.W.2d 909, 913 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd) ("Texas courts consistently uphold DWI convictions based upon the opinion testimony of police officers who

10

observed the defendant's unsatisfactory performance in field sobriety tests."). Evidence of a police officer's observations of a defendant's behavior and demeanor, together with the officer's opinion that the defendant was intoxicated, is sufficient to uphold a conviction for DWI. *See Annis v. State*, 578 S.W.2d 406, 407 (Tex. Crim. App. 1979); *Zill v. State*, 355 S.W.3d 778, 785–86 (Tex. App.— Houston [1st Dist.] 2011, no pet.).

The record in this case is replete with evidence that Stephens was intoxicated while driving on I-35. For over ten minutes, Thomas—who provided her name and phone number to the 911 dispatcher—relayed Stephens's highly dangerous and reckless driving. *See Derichsweiler v. State*, 348 S.W.3d 906, 914–15 (Tex. Crim. App. 2011) ("[I]nformation provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable."). Moreover, she corroborated the contents of her 911 call in her testimony at trial. Stephens was unable to maintain a lane, swerved from one side of the highway to the other, nearly collided with a semi-truck and with a permanent concrete barricade, drove on the shoulder, and varied his truck's speed from ten miles per hour over the speed limit to twenty-five miles per hour under it. Officer Carter likewise paced Stephens's truck and determined that Stephens was speeding. *See Zill*, 355 S.W.3d at 786 ("Additionally, '[s]peeding can indicate impaired mental judgment and, therefore, is a factor to be considered.'" (quoting *Texas Dep't of Pub. Safety v. Gilfeather,* 293 S.W.3d 875, 880 (Tex. App.—Fort Worth 2009, no pet.))). Officers Carter and Pedraza smelled alcohol from Stephens's breath and truck, and Stephens's eyes were glossy, glassy, and red. Officer Pedraza found "fresh liquid" and several empty bottles, including two bottles of Smirnoff Ice, in the truck. *See Priego v. State*, 457 S.W.3d 565, 570 (Tex. App.—Texarkana 2015, pet. ref'd) (upholding conviction in part because evidence showed that there was partially consumed bottle of alcohol inside car and that

11

defendant smelled like alcohol). And Stephens himself admitted to having had two or three drinks. Stephens's witness, Officer Underwood, testified that Officers Carter and Pedraza were in a better position than he was to observe Stephens's state. Their observations alone, when coupled with their conclusions that Stephens was intoxicated or was unable to "control his body," were sufficient evidence that he was intoxicated. *See Annis*, 578 S.W.2d at 407; *Zill*, 355 S.W.3d at 785–86.

Additionally, Stephens performed poorly on the SFSTs. *See Finley*, 809 S.W.2d at 913. During the HGN, he swayed and turned his head, and his eyes jerked when following Officer Carter's pen. Stephens failed to step heel-to-toe during the walk-and-turn. He also stepped off the line, turned improperly, and lost his balance. While standing on one leg, he used his arms for balance, swayed, put his foot down, and nearly hopped—against the shoulder's downward slope—into traffic; it was one of the worst one-leg stands that Officer Carter had ever seen.

Although Officer Carter made mistakes in administering the SFSTs, he testified that his deviations were "slight" and did not affect his determination that Stephens was intoxicated. There was no evidence that Stephens had any medical condition that would have affected his ability to complete the tests, and even Officer Underwood conceded that Stephens's hopping during the one-leg stand did not result from Officer Carter's instructions or demonstration. Officer Underwood also conceded that Stephens lost his balance, was not fully heel-to-toe, and made a "wide step to the right" during the walk-and-turn and that he lost his balance multiple times, leaned over, and hopped during the one-leg stand. Notably, the mistakes identified by Officer Underwood were not directly related to the clues observed by Officers Carter and Pedraza. What is more, Stephens was not only familiar with the instructions for SFSTs; he had taught others how to conduct them and had made DWI arrests. A rational juror could have inferred that he

12

should have been aware of how to perform the SFSTs regardless of any error made by Officer Carter.

Lastly, at the time of his arrest, Stephens was initially unable to remember whether he had a firearm in his truck. And contrary to Officer Underwood's testimony, the jury was free to consider Stephens's refusal to provide a blood sample as evidence of his guilt. *See* Tex. Transp. Code § 724.061 (providing that person's refusal to submit breath or blood specimen, "whether the refusal was express or the result of an intentional failure to give the specimen, may be introduced into evidence at the person's trial"); *Bartlett*, 270 S.W.3d at 153 (stating that refusal to provide specimen "tends to show a consciousness of guilt"); *see also South Dakota v. Neville*, 459 U.S. 553, 564 (1983) (holding that "a refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination").

The DWI investigation in this case took place immediately after Thomas's 911 call and after Stephens was driving on I-35. From the evidence detailed above, a rational juror could have found beyond a reasonable doubt that at the time Stephens was operating his vehicle, he lacked "the normal use of mental or physical faculties by reason of the introduction of alcohol." *See* Tex. Penal Code § 49.01(2). We therefore overrule Stephens's sole issue on appeal.

## CONCLUSION

Having overruled Stephens's only issue, we affirm the trial court's judgment of conviction.

13

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed:   April 10, 2026

Do Not Publish