

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00051-CR

_____

BEN MEADWAY, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Criminal Court No. 3
Tarrant County, Texas
Trial Court No. 1252112

Before Meier, Kerr, and Pittman, JJ.
Memorandum Opinion by Justice Meier

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Ben Meadway appeals his conviction for driving while intoxicated (DWI), in which the trial court imposed twelve months' community supervision. In two points, Meadway argues that the evidence is insufficient to prove that he was intoxicated and that the trial court erroneously assessed a $100 "Emergency Management Services" (EMS) cost. We conclude that the evidence supports the jury's DWI verdict, but we hold that the trial court erred by assessing the $100 EMS cost. Thus, we will modify the trial court's assessed court costs to delete the $100 EMS cost and will affirm the trial court's judgment as modified.

## II. BACKGROUND

Brian Wall, a paramedic who was the passenger in an ambulance transporting a pregnant woman at roughly 2:45 a.m. on August 28, 2011, observed Meadway driving erratically on Westbound Highway 183. By Wall's account, Meadway was continuously driving back and forth across three lanes of traffic without using his turn signals. After observing this erratic driving for about three miles, Wall called 911.

In the 911 call, which was played for the jury, Wall described how Meadway switched lanes erratically, seemingly attempted to exit the highway at times but then swerved back into multiple lanes, almost "crash[ed] on the shoulder," and struck a construction barrier with his truck on the front-right side but continued driving. Wall stayed on the phone until he saw a police cruiser signal Meadway to stop. At trial,

2

Wall described many of the same things that he had explained in the 911 call, including how Meadway had struck the construction barrier.

Officer Brianne Dibley-Tebay of the City of Hurst Police Department testified that she received a 911 dispatch that morning regarding Wall's 911 call. According to Dibley-Tebay, she located Meadway's truck in the location that Wall had described. Dibley-Tebay described how she pulled her cruiser behind Meadway in order to observe his driving and to see if she could corroborate Wall's information. Dibley-Tebay said that she initially observed Meadway driving in the righthand lane but that after he crossed over the white line onto the shoulder several times, she initiated a stop. As she initiated the stop, Officer Jason Delfeld of the City of Hurst Police Department also arrived on the scene.

Dibley-Tebay said that she approached the passenger side of Meadway's truck as Delfeld approached the driver's side. As she approached, Dibley-Tebay testified that she could smell the odor of an alcoholic beverage coming from the truck. Dibley-Tebay said that as she got near Meadway later on, she could smell a "pretty stout" odor of alcohol from his breath. Although Delfeld administered field-sobriety tests, Dibley-Tebay said that she observed Meadway swaying as he stood and talked to Delfeld, that he used his arms to balance during the one-leg stand test, that he put his foot down during the one-leg stand test, and that he failed parts of the walk-and-turn test. Dibley-Tebay averred that she also observed damage on the front-right-quarter panel of Meadway's truck, including some scuff marks and freshly scuffed paint,

3

which she surmised indicated that he had hit the concrete construction barrier as Wall had described. Dibley-Tebay stated that based on her experience, she believed Meadway was intoxicated at the time she pulled him over.

Delfeld testified that he received two dispatch calls regarding Meadway's erratic driving that morning. After conferring with Dibley-Tebay on what she had observed, he made initial contact with Meadway by approaching the driver's side of the truck. Delfeld said that he asked Meadway whether he had been drinking and that Meadway acknowledged he had consumed some alcohol. Delfeld also said that Meadway's answers to his questions about where Meadway was coming from were inconsistent— initially Meadway said he was coming from Georgia, but he later changed his answer to North Richland Hills. Delfeld averred that the North Richland Hills answer was suspicious to him because Meadway was actually driving toward North Richland Hills. According to Delfeld, Meadway eventually changed his answer again and said that he was driving back from Dallas. Delfeld also stated that Meadway had watery eyes, slurred speech, and the smell of an alcoholic beverage emitting from him. Delfeld said that he too observed the "fresh damage" to the truck but that Meadway denied having hit a concrete barrier.

Delfeld averred that Meadway agreed to submit to field sobriety tests, so Delfeld had Meadway exit the truck and walked him back behind the truck for safety reasons. As he administered the tests to Meadway, Delfeld said that he observed six out of six clues on the horizontal gaze nystagmus test and three out of "several clues"

on the walk-and-turn test. Delfeld also said that Meadway raised his arms for balance, put his foot down, and had to be instructed to continue performing the one-leg-stand test. Based on his observations, Delfeld concluded that Meadway was intoxicated and placed him under arrest for DWI. According to Delfeld, Meadway denied consent for either a blood or breath sample.

The State introduced the video from Dibley-Tebay's dashboard camera and played it for the jury. In the video, Dibley-Tebay is initially driving behind Meadway's truck on the highway. Meadway's truck veers over the shoulder stripe multiple times, and on one occasion, his truck veers almost entirely onto the shoulder. The video also shows the reflection of Dibley-Tebay's overhead lights as she initiated the stop. Shortly after the stop, Delfeld and Dibley-Tebay approach the truck. Not long after that, Delfeld escorts Meadway to the area behind his truck and in front of Dibley-Tebay's patrol vehicle, where Delfeld conducts field-sobriety tests of Meadway. During the walk-and-turn test, Meadway loses his balance, sways back and forth, and then falls back slightly as he ends the test. During the one-leg-stand test, Meadway loses his balance, causing him to put his foot down prior to Delfeld's instruction to do so. Both Delfeld and Dibley-Tebay examine the truck's front-right fender during the stop. Delfeld then handcuffs Meadway and tells him that he is being arrested for DWI.

Brandon Yaites testified for the defense. According to Yaites, he was very familiar with the truck Meadway was driving on the morning of his arrest. Yaites averred that the truck "was on its last leg" and that it was damaged "inside and out."

Meadway testified in his own defense as well. Meadway said that the truck he was driving the morning he was arrested was not his personal vehicle but rather a work truck. He also averred that the truck had "substantial damage to the front end [and was] very hard to control." Meadway described the steering wheel as having "a four-inch play in" it. He attributed his erratic driving to the truck's defects. Meadway also denied having struck any type of barrier that morning.

By Meadway's account, even though he admitted that he had drunk two or three beers the evening before his arrest, he believed that he had passed the field-sobriety tests, he questioned Delfeld about why he was being arrested, and Delfeld never told him that having his blood drawn was an option.

A jury found Meadway guilty of DWI. The trial court assessed punishment at ninety days in jail but probated the sentence and placed Meadway on twelve months' community supervision. The trial court also assessed a $1500 fine and $435.10 in court costs. In the bill of costs, the trial court included the assessment of a $100 EMS fee. This appeal followed.

6

# III. DISCUSSION

## A. Sufficiency of the Evidence

In his first point, Meadway argues that the evidence is insufficient to support the jury's verdict that he was driving while intoxicated. We disagree.

### 1. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable

7

based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for

that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

### 2. Law Regarding Driving While Intoxicated

A person commits the offense of DWI when that person is intoxicated while operating a motor vehicle in a public place. *See* Tex. Penal Code Ann. § 49.04(a) (West Supp. 2018). Intoxicated means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." Tex. Penal Code Ann. § 49.01(2)(A) (West 2011).

As a general rule, a police officer's testimony regarding intoxication is sufficient to prove intoxication. *Annis v. State*, 578 S.W.2d 406, 407 (Tex. Crim. App. [Panel Op.] 1979); *Green v. State*, No. 02-13-00180-CR, 2014 WL 2538802, at *3 (Tex. App.—Fort Worth June 5, 2014, pet. ref'd) (mem. op., not designated for publication). Furthermore, eyewitnesses' observations are relevant and probative of intoxication. *Lopez v. State*, 279 S.W.3d 727, 729–30 (Tex. App.—Amarillo 2007, no pet.); *Martinez v. State*, 155 S.W.3d 491, 496–97 (Tex. App.—San Antonio 2004, no pet.). Additionally, intoxication may be proved by a combination of individual characteristics that when considered individually do not necessarily prove intoxication. *Cotton v. State*, 686 S.W.2d 140, 142 (Tex. Crim. App. 1985). Characteristics that constitute evidence of intoxication include erratic driving and post-driving behavior such as stumbling, swaying, slurring or mumbling words, and bloodshot eyes. *Kirsch v.*

9

*State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010); *Griffith v. State*, 55 S.W.3d 598, 601 (Tex. Crim. App. 2001); *Cotton*, 686 S.W.2d at 142–43, 142 n.3. Other probative evidence of intoxication includes an individual's refusal to provide a breath or blood sample because it establishes a consciousness of guilt. Tex. Transp. Code Ann. § 724.061 (West 2011); *Bartlett v. State*, 270 S.W.3d 147, 153 (Tex. Crim. App. 2008); *Rogers v. State*, No. 02-13-00235-CR, 2014 WL 1257291, at *4 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op., not designated for publication). And an individual's performance on standardized field sobriety tests indicating that he has lost the use of his normal mental and physical faculties also constitutes evidence of intoxication. *Kirsch*, 306 S.W.3d at 745; *Emerson v. State*, 880 S.W.2d 759, 768–69 (Tex. Crim. App. 1994); *Zill v. State*, 355 S.W.3d 778, 786 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

### 3. The Evidence in This Case Supports the Jury's Verdict

Here, when viewing the evidence in a light most favorable to the jury's verdict, the evidence is sufficient to prove that Meadway was driving while intoxicated. It is undisputed that Meadway was operating a motor vehicle in a public place. And the record evidence sufficiently establishes that Meadway did not have the normal use of his mental or physical faculties because he had consumed alcohol. Indeed, two eyewitnesses to Meadway's erratic driving called 911 to report what they had seen. One of those witnesses, Wall, testified that Meadway was continuously driving back and forth across several lanes of traffic without using his signal and that Meadway had

struck a concrete construction barrier and yet continued driving. In Wall's 911 call, he reported that Meadway switched lanes erratically, seemingly attempted to exit the highway but then swerved back across multiple lanes, and almost crashed into a concrete barrier before actually colliding with one.

When she pulled behind and followed Meadway, Dibley-Tebay observed him drive over the shoulder stripe multiple times, and the video from her dashboard camera confirmed her account. Both Dibley-Tebay and Delfeld testified that the smell of an alcoholic beverage emanated from Meadway. And Delfeld testified that Meadway gave him conflicting answers regarding where he was traveling from.

Furthermore, Delfeld testified that when he conducted field-sobriety tests on Meadway, he observed six out of six clues on the horizontal gaze nystagmus test, three clues on the walk-and-turn test, and multiple clues on the one-leg-stand test. The video from Dibley-Tebay's dashboard camera corroborated Delfeld's testimony. Delfeld also testified that Meadway had watery eyes and slurred speech. Moreover, even though Dibley-Tebay did not administer the tests, she too observed Meadway swaying as he stood and talked to Delfeld, using his arms to balance during the one-leg-stand test, putting his foot down during that test, and failing parts of the walk-and-turn test.

Both Dibley-Tebay and Delfeld observed "fresh" damage to the right-front panel of Meadway's truck, and Delfeld noticed a scuff mark on the tire area—damage consistent with Wall's report that Meadway had struck a concrete construction barrier.

11

And Meadway admitted to having imbibed alcohol before driving. Additionally, Delfeld averred that Meadway refused to submit to either a breath or blood test, which is evidence that he consciously knew he was intoxicated. Delfeld stated that he arrested Meadway because he believed Meadway was intoxicated. Dibley-Tebay also averred that she believed that Meadway was intoxicated. Either of these officers' testimony alone was sufficient to prove that Meadway was intoxicated.

Meadway argues that the evidence is insufficient to prove intoxication because he and Yaites testified that the truck had mechanical problems at the time he was driving the truck. But the jury was free to disbelieve this testimony.

We hold that a rational factfinder could have found that Meadway was intoxicated at the time he was operating his truck on a public highway. *See* Tex. Penal Code Ann. § 49.04(a); *see also Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 622. We overrule Meadway's first point.

## B.     Emergency Management Services Cost

In his second point, Meadway argues that the trial court erred by assessing the $100 EMS fee as part of its imposed court costs. The State concedes that the trial court erred by assessing the $100 EMS fee. We agree with both parties.

This court has already held that the EMS fee that Meadway complains of is facially unconstitutional. *See* Tex. Code Crim. Proc. Ann. art. 102.0185(a) (West 2018); *see Casas v. State*, 524 S.W.3d 921, 923, 925–27 (Tex. App.—Fort Worth 2017, no pet.) ("Neither the statute authorizing the collection of the emergency-services

12

cost nor its attendant statutes direct the funds to be used for a legitimate, criminal-justice purpose; therefore, it is a tax that is facially unconstitutional."). The proper remedy is to modify the judgment by subtracting the $100 EMS fee from the total costs assessed in the judgment. *See Albrecht v. State*, No. 02-16-00316-CR, 2018 WL 285081, at *1 (Tex. App.—Fort Worth Jan. 4, 2018, no pet.) (mem. op., not designated for publication) (modifying trial court's judgment by subtracting $100 EMS fee from total assessed court costs). Thus, we sustain Meadway's second point.

## IV. CONCLUSION

Having overruled Meadway's first point and having sustained his second point, we modify the trial court's judgment to show that the total assessed court costs are $335.10, not the $435.10 assessed in the original judgment, and we affirm the trial court's judgment as modified.

/s/ Bill Meier
Bill Meier
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 29, 2018