

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-15-00614-CR

The **STATE** of Texas,
Appellant

v.

Preston Mitchell **EVANS**,
Appellee

From the County Court, Bandera County, Texas
Trial Court No. 14-00360
Honorable Richard A. Evans, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  July 20, 2016

AFFIRMED

The State appeals the trial court's order granting Preston Mitchell Evans's motion to suppress, arguing that the trial court erred because Evans's detention and warrantless arrest was reasonable under the United States Constitution, the Texas Constitution, and other statutes raised in Evans's suppression motion. We affirm the order of the trial court.

## BACKGROUND

In the trial court, Evans filed a motion to suppress, arguing that he was illegally detained and subsequently arrested without a warrant and without probable cause in violation of the U.S. Constitution, and the laws and constitution of the State of Texas. Evans argued in his motion that there was no reasonable suspicion or probable cause to administer field sobriety tests and that he was unlawfully detained. Further, Evans argued the totality of the circumstances did not give the officer probable cause to arrest him for DWI. Evans thus requested that all evidence obtained after his detention and arrest, whether it be in the form of statements, conduct, testimony or actual physical evidence obtained by officers, be suppressed.

At the suppression hearing, the State stipulated that Evans was arrested without a warrant. The State then called State Trooper Anthony Aragones to testify. Trooper Aragones testified that he had worked for the Department of Public Safety for twelve years, was TCLEOSE certified, and was certified in field sobriety. He testified that on August 31, 2014, he was stopped on the side of Highway 173 in Bandera County when he saw a vehicle approach. After determining that the vehicle was traveling 46 miles per hour in a 35 miles per hour speed zone, he stopped the vehicle.

Trooper Aragones testified that the driver of the vehicle, Preston Mitchell Evans, was speeding. According to Trooper Aragones, when he approached the vehicle, in which two passengers were also seated, he could smell the odor of alcohol emanating from the vehicle. Trooper Aragones asked Evans to exit his vehicle and come to the back of his vehicle. He asked Evans where he was going. Evans replied, "Right here." Evans pointed to a driveway twenty feet away and explained that he and his friends had been at a rodeo and were coming back to his friend's home. Trooper Aragones testified that he did not end the encounter and give Evans a speeding ticket because he could smell alcohol on Evans's breath. Trooper Aragones asked Evans if he had been drinking. Evans replied that he had had two whiskey drinks.

Trooper Aragones testified that he then performed a horizontal gaze nystagmus ("HGN") test on Evans. Trooper Aragones asked Evans if he had any head injuries and whether he was wearing contacts. Evans replied that he had an astigmatism in his eye. Trooper Aragones explained that during the HGN test, the officer looks for the jerking of the subject's eyes as they move side to side. According to Trooper Aragones, the jerking of the eyes is an involuntary movement when alcohol is introduced into your system. He testified that nystagmus is present all the time, but cannot be seen with the naked eye until alcohol enhances its effects. Trooper Aragones testified that Evans's "pupil size were fine" and that Evans "had equal tracking." However, according to Trooper Aragones, Evans showed all six clues during the HGN test.

Trooper Aragones then asked Evans if he had any ankle, knee, or leg problems because the next field sobriety test would involve walking and standing. Evans said that he had left leg problems from an injury in high school and that he had injured his right ankle in college. Trooper Aragones testified that because of these injuries reported by Evans, he decided not to proceed with those field sobriety tests. So, Trooper Aragones did not request that Evans perform the walk-and-turn or the one-leg stand tests. Trooper Aragones then asked Evans if he would recite the alphabet. Evans replied that he could not perform that test because he was dyslexic. Trooper Aragones then asked Evans to blow into his portable breath tester, and Evans refused. Trooper Aragones arrested Evans for DWI.

On cross examination, defense counsel quizzed Trooper Aragones about the phases of DWI detection. Trooper Aragones agreed that during the first phase, observing the vehicle in motion, there were no signs of intoxication. Trooper Aragones did not observe the vehicle driven by Evans straddling a lane, swerving, or crossing lines. Further, Trooper Aragones agreed that Evans was not slow to respond to the patrol car's lights. Evans stopped properly and pulled over safely. Trooper Aragones admitted that he did not observe anything wrong with Evans's driving.

During the second phase of DWI detection, personal contact, Trooper Aragones agreed that Evans was not argumentative and when asked to produce his driver's license, Evans did not fumble with it. Trooper Aragones admitted that he only had to ask Evans once for him to comply with instructions. After Trooper Aragones asked Evans to exit his vehicle, Evans did so without difficulty. Trooper Aragones then asked Evans to go to the back of his vehicle. Trooper Aragones admitted that Evans did not stumble and was not unsteady on his feet. Trooper Aragones also admitted that Evans's speech was not slurred, and Evans's eyes were not bloodshot. Evans answered every question and was polite. Evans did not use his vehicle to balance himself. Trooper Aragones conceded that the odor of alcohol was the only observation he made that Evans was intoxicated.

With regard to the third phase of DWI detection, Trooper Aragones testified that he performs field sobriety tests in the following order: HGN, walk-and-turn, and one-leg stand. Trooper Aragones testified that he performed the HGN test and found six clues. He testified that when he performed the HGN test, he placed Evans on the edge of the shoulder of the highway between both vehicles. Trooper Aragones testified that the emergency lights on his patrol car were on. According to Trooper Aragones, the first set of lights in the back window right above the hood were on, and the red and blues on top of the hood of the vehicle facing the rear were on. Trooper Aragones testified that both sets of emergency lights were on for his and Evans's safety. Evans was facing towards the highway looking at Trooper Aragones, and Trooper Aragones's back was at the highway. On cross-examination, Trooper Aragones was asked whether he knew what "optokinetic nystagmus" was. Trooper Aragones replied that optokinetic nystagmus was the "rotation of the lights or of light." Trooper Aragones was asked if a trooper is trained to be facing away from the highway so as to avoid any problem with the lights going by on the highway. Trooper Aragones testified that "[l]ights come into effect sometimes" but that he wants

"defendants out of the way of traffic for safety." So, he "put[s] them up against the bar ditch to get them out of the way if needed." Defense counsel recognized this safety concern but asked how Trooper Aragones avoided the problem with optokinetic nystagmus. Trooper Aragones responded that he avoids the problem by turning the lights off on his patrol vehicle. Defense counsel reminded Trooper Aragones that he had testified his emergency lights were on. Defense counsel asked Trooper Aragones, "You testified both your overheads and your back emergency lights were on. And the defendant was to the left, so he had a vision of those lights; is that correct?" Trooper Aragones replied, "I don't think – they're not in his eyes. He might see them maybe if he turns and looks over there, but not when he's just looking at me." Defense counsel asked, "Aren't you trained, sir, to have [Evans's] back against any light, sir?" Trooper Aragones replied, "We know about the lights. That's why we turn my overheads off. All I had was my rears on. There's no fronts to keep the – if another officer would be in front of me, I would have them turn theirs off. There wasn't another officer there." Defense counsel then asked about the lights of vehicles passing by affecting the test. Trooper Aragones testified that lights from a passing vehicle could "possibly" affect the test, "but you've got to have cars out there to do it." After watching the dash cam video, Trooper Aragones admitted that one vehicle passed by during the test. Trooper Aragones testified that after performing the HGN test, he had not yet decided to arrest Evans. According to Trooper Aragones, "[T]hat's why I was going to do more tests. I was still investigating to see if [Evans] could safely drive home."

Trooper Aragones testified that if a suspect cannot perform a test because of injury or physical disability, he will give the suspect an alternative test. Because Evans reported leg injuries in the past, Trooper Aragones testified that he did not ask Evans to perform the walk-and-turn or the one-leg stand. Instead, Trooper Aragones asked Evans to perform the alternative test of reciting the alphabet. However, Evans said he could not do such a test because he is dyslexic. When asked

on cross-examination about other alternative tests, Trooper Aragones named "the Romberg" and "the finger count." He could not name the other alternative tests. Trooper Aragones testified that he did not offer the finger count test because that test was "just not one of the tests – alternative tests [he] use[s]." Instead, Trooper Aragones testified that he asked Evans to perform a "PBT" (a portable breath test). According to Trooper Aragones, "I didn't use another alternative. I went to the next step that I use, and that's the PBT." Evans refused to give a breath sample into the PBT. On cross-examination, Trooper Aragones admitted that the PBT is not an alternative test, "is not approved by the DPS for criminal prosecution," and is not admissible as evidence at trial. According to Trooper Aragones, he just uses it as a "tool."

Noting that Trooper Aragones had decided not to arrest Evans after the HGN test, defense counsel asked Trooper Aragones what he observed after the HGN test led him to believe he had probable cause to arrest Evans for DWI. Trooper Aragones responded,

> I didn't have anything because he didn't do anything. He wouldn't perform the alphabet, PBT. I couldn't do the one-leg stand [or] the walk-and-turn because he was hurt or he was injured at some time. I asked him to perform the alphabet and he said he was dyslexic.

Defense counsel asked, "So until you asked him for the portable breath test, you did not have probable cause?" Trooper Aragones replied, "No. I'm investigating. When he refused the PBT, he was placed under arrest."

During Trooper Aragones's testimony, he was asked to watch the dash cam video. He testified that Evans was swaying back and forth during the HGN test and that the best way to notice the swaying was to "watch the bush in the background."

After hearing Trooper Aragones's testimony and watching the dash cam video, the trial court granted Evans's motion to suppress. The trial court then made findings of fact and

conclusions of law. Of the thirty-eight findings of fact made by the court, the following are the most pertinent to this appeal:

1. Trooper Aragones, in a stationary position, observed a vehicle driven by Evans traveling in excess of the posted thirty-five mile per hour speed zone on State Highway 173 South in Bandera County, Texas.

2. Trooper Aragones testified that he is trained to observe a person driving for possible clues of intoxication. The trooper did not testify that he visually observed clues of an impaired driver.

3. Evans was not slow to respond to the trooper's emergency light.

4. Evans pulled over in response to the trooper in a safe manner and pulling over a safe distance from the roadway.

5. Evans did not have blood-shot eyes or slurred speech. Evans was polite and cooperative. Trooper Aragones had no difficulty communicating with Evans. Trooper Aragones indicated if these conditions were observed by him, he would have indicated same in the offense report.

6. Evans produced his driver's license when requested by the trooper to do so. He did so without difficulty or fumbling.

7. Trooper Aragones requested Evans to exit the vehicle. The trooper did not observe any evidence of impairment upon Evans exiting the vehicle. Evans did not exhibit any difficulty exiting the vehicle, did not use the vehicle for support, and was not unsteady on his feet and was able to follow the trooper's instructions.

8. Evans was instructed to stand on the side of the road with his feet together and hands at his side. The field video indicates that Evans remained in this position for two minutes during which time Evans was not swaying and was not unsteady on his feet.

9. Evans admitted to consuming alcohol, with his last drink of an alcoholic beverage being approximately thirty minutes prior to being stopped by Trooper Aragones. When asked by the trooper about the two beers he had consumed, Evans corrected the trooper and stated that he had consumed two whiskey drinks, not beers.

10. Trooper Aragones performed the HGN test on Evans. Evans was able to perform the test and to follow the trooper's instructions.

11. When testing for HGN, Evans was facing the roadway.

12. Trooper Aragones indicated that no vehicles were on the roadway when the HGN was being performed. The field video indicated there was at least one vehicle traveling south when the HGN test was performed by Evans.

13. Trooper Aragones indicated that Evans swayed back and forth during the HGN test.

14. Trooper Aragones testified that he observed six clues.

15. The trooper asked Evans if he had any ankle, knee, or leg problems. Evans responded that he had left knee and right ankle injuries in the past.

16. Trooper Aragones did not ask Evans the extent of his injuries.

17. Evans was not requested by the trooper to perform the walk-and-turn or one-leg stand tests.

18. Evans did not refuse to perform any standard field sobriety tests.

19. Evans was asked to recite the alphabet.

20. Evans stated that he was dyslexic.

21. Trooper Aragones did not offer any other alternative tests to the standard field sobriety tests. The trooper could not name the five alternate tests listed on the SFST Scoring Sheet if any injury was claimed.

22. Evans was requested to perform a breath sample with the preliminary breath tester, which he refused.

23. Trooper Aragones indicated that Evans's arrest was based on his symptoms of intoxication and his performance during the standard field sobriety tests. Trooper Aragones identified the symptoms of intoxication to be the odor of alcohol and six clues on the HGN.

24. The trooper indicated that following the HGN test, he did not feel he had adequate probable cause to arrest Evans.

25. When asked if he could identify any symptoms of intoxication after the performance of the HGN, Trooper Aragones could not.

26. At no time during the stop, search, or detention of Evans did the trooper have an arrest or a search warrant.

27. The information, testimony, and evidence provided by the State was not credible that there was probable cause to arrest Evans for driving while intoxicated.

28. Trooper Aragones had no specific articulable facts or reasonable inferences therefrom that would cause a reasonable person to believe that Evans was, had been or soon would be engaged in criminal conduct or activity. A reasonable officer, or one who was correctly interpreting the law, would not have had a reasonable suspicion to initiate the detention; therefore, the detention was unreasonable.

The trial court also made the following conclusions of law:

1. Trooper Aragones lacked reasonable suspicion to seize and/or detain Evans on August 31, 2014.

2. Trooper Aragones lacked probable cause to arrest Evans for driving while intoxicated in violation of Evans's rights under the United States and Texas Constitutions and article 38.23 of the Texas Code of Criminal Procedure.

3. All evidence obtained by the State after the seizure and/or detention of Evans was obtained illegally and is therefore suppressed.

4. The Court has the sole discretion to judge the credibility of witnesses and evidence, and is the sole judge of the credibility of the evidence and weight to be given such evidence. Further, the trial court is free to believe or disbelieve any or all parts of a witness's testimony, and the Court did not accept the premise that Trooper Aragones had a "good faith" belief that any criminal activity had, was or was about to be committed.

The State now appeals the trial court's granting of Evans's motion to suppress.

## MOTION TO SUPPRESS

When reviewing a trial court's ruling on a motion to suppress, we give almost total deference to the court's determination of the historical facts that the record supports, especially when those fact findings are based on an evaluation of the witnesses' credibility and demeanor. *Leming v. State*, No. PD-0072-15, 2016 WL 1458242, at *7 (Tex. Crim. App. Apr. 13, 2016); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We accord the same level of deference to the trial court's rulings on mixed questions of law and fact if those decisions turn on the credibility and demeanor of the witnesses. *Guzman*, 955 S.W.2d at 89. We review de novo mixed questions of law and fact that do not turn on witness credibility. *Id.*

The trial court in this case found that Trooper Aragones observed Evans speeding in his vehicle. "In a motion to suppress hearing, the trial court is the sole trier of fact and judge of the credibility of the evidence and the weight to be given their testimony." *State v. Gray*, 158 S.W.3d 465, 466 (Tex. Crim. App. 2005) (quoting *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). "Accordingly, the judge may believe or disbelieve all or any part of a witness's testimony,

even if that testimony is not controverted." *Id.* (quoting *Ross*, 32 S.W.3d at 855). "This is so because it is the trial court that observes firsthand the demeanor and appearance of a witness, as opposed to an appellate court that can only read an impersonal record." *Id.* at 466-67 (quoting *Ross*, 32 S.W.3d at 855). An appellate court "may review de novo 'indisputable visual evidence' contained in a videotape." *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) (quoting *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000)). However, an appellate court "must defer to the trial judge's factual finding on whether a witness actually saw what was depicted on a videotape or heard what was said during a recorded conversation." *Id.* at 571. Here, Trooper Aragones's testimony supports the trial court's finding that Trooper Aragones observed Evans speeding. The dash cam video does not contradict this finding. Thus, because the trial judge was the factfinder who judged Trooper Aragones's credibility and demeanor, we defer to the trial judge with regard to this finding. *See id.* Accordingly, we conclude that Trooper Aragones's initial detention of Evans for a traffic stop was valid.

The issue thus becomes whether Trooper Aragones lawfully prolonged the traffic stop and had reasonable suspicion to continue his detention for the purposes of investigating Evans for DWI. "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). As a "'relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called "Terry stop" . . . than to a formal arrest.'" *Id.* (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)) (alteration in original). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." *Id.* (citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have

been—completed." *Id.* "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop." *Id.* at 1615 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)) (alteration in original). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. Thus, the question in this case is whether Trooper Aragones, after the traffic stop, had reasonable suspicion to continue Evans's detention and investigate whether Evans was driving while intoxicated.

"Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Id.* "This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was objectively justifiable basis for the detention." *Id.* "It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Id.*

A person commits the offense of driving while intoxicated if he "is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE ANN. § 49.04(a) (West Supp. 2015). "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." *Id.* § 49.01(2)(A) (West 2011). Thus, we must determine whether under the totality of the circumstances, Trooper Aragones had specific, articulable facts that, combined with rational inferences from those facts, led him to

reasonably conclude that Evans was driving his vehicle while not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body. *See Derichsweiler*, 348 S.W.3d at 914.

In its conclusions of law, the trial court determined that Trooper Aragones did not have reasonable suspicion to believe that Evans had been operating his vehicle while intoxicated. The State argues that the trial court erred in making this legal conclusion because of Trooper Aragones's testimony that he decided to investigate whether Evans was driving while intoxicated because he smelled alcohol emanating from the vehicle, because he smelled alcohol on Evans's breath, and because Evans said that he had consumed two alcoholic beverages. The State also points to Trooper Aragones's testimony that speeding was a sign of intoxication.[1]

The trial court considered more than just the specific instances of Trooper Aragones's testimony pointed out by the State. The trial court considered the totality of the circumstances, finding the following:

(1) Evans was not slow to respond to the trooper's emergency light.

(2) Evans pulled over in response to the trooper in a safe manner and pulled over a safe distance from the roadway.

(3) Evans did not have blood shot eyes or slurred speech.

(4) Evans was polite and cooperative.

(5) The trooper had no difficulty communicating with Evans.

(6) Evans produced his driver's license when requested by the trooper to do so. Evans did so without difficulty or fumbling.

---

[1]On cross-examination, defense counsel questioned Trooper Aragones by asking him to confirm that speeding was not a sign of intoxication. Trooper Aragones replied that both speeding and traveling below the speed limit are signs of intoxication. Defense counsel asked, "Are you sure, sir?" Trooper Aragones replied, "I'm pretty sure." When asked if he had his manual with him, Trooper Aragones replied that he did not. The trial court found that Trooper Aragones did not testify that he visually observed clues of an impaired driver. We can infer from this finding that the trial court did not find Trooper Aragones's testimony that speeding was a sign of intoxication to be credible testimony.

(7) The trooper did not observe any evidence of impairment when Evans exited his vehicle. Evans did not exhibit any difficulty exiting the vehicle, did not use the vehicle for support, was not unsteady on his feet, and was able to follow the trooper's instructions.

(8) Evans was instructed by the trooper to stand on the side of the road with his feet together and hands at his side. Evans remained in this position for two minutes during which time Evans did not sway and was not unsteady on his feet.

(9) When asked by the trooper about the two beers he had consumed, Evans corrected the trooper and stated that he had consumed two whiskey drinks, not beers.

In our review of the dash cam video, we find that Evans did not sway, was not unsteady on his feet, stood still and erect for a significant period of time, was polite, was not belligerent or argumentative, did not have slurred speech, walked normally, and did not stumble. *See Duran*, 396 S.W.3d at 570. While Evans admitted to having consumed alcohol, all the other specific and articulable facts in this case point to Evans having the normal use of his physical and mental faculties at the time he was stopped for a traffic violation. Thus, considering the totality of circumstances, we cannot find error by the trial court in concluding that the trooper did not have reasonable suspicion to conclude that Evans was driving while intoxicated.

Further, even if Trooper Aragones had reasonable suspicion to conclude that Evans was driving while intoxicated, Trooper Aragones did not have probable cause to arrest Evans for DWI. "Under the Fourth Amendment, a warrantless arrest for an offense committed in the officer's presence is reasonable if the officer has probable cause." *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). "'Probable cause' for a warrantless arrest exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense." *Id*. "The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officers," and "requires a consideration of the totality of the circumstances facing the arresting officer." *Id*. A finding of

probable cause requires "more than bare suspicion" but "less than . . . would justify . . . conviction." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

The State points to the following as evidence of probable cause: Evans speeding, Evans admitting to having consumed alcohol, the smell of alcohol on Evans's breath, the six clues found by Trooper Aragones during the HGN test, Evans's swaying during the HGN test, Evans's failure to perform the walk-and-turn or one-leg stand tests, Evans's refusal to recite the alphabet, and Evans's refusal to use the portable breath tester. First, we note that the trial court found Trooper Aragones's testimony was not credible and specifically found facts criticizing Trooper Aragones's testimony about the HGN test. During the cross-examination of Trooper Aragones, defense counsel showed that Trooper Aragones faced Evans toward lights even though Trooper Aragones knew that lights could affect the test results. In its findings, the trial court explained that although Trooper Aragones testified no vehicles were on the highway during the HGN (and thus the test would not be affected by the lights of passing vehicles), the dash cam video shows at least one vehicle traveling south during the HGN test. The trial court noted that although Trooper Aragones testified that Evans was swaying during the HGN test, the video shows Evans was not swaying and was not unsteady on his feet. The trial court also found that while Trooper Aragones performed the HGN test, Evans "was able to keep his head still and to follow the stimulus with only his eyes." The trial court found that Evans "was able to perform the test and follow the trooper's instructions." Thus, the trial court did not find Trooper Aragones's testimony about the HGN test to be credible, and we must defer to the factfinder.

Second, the evidence shows that Evans did not refuse field sobriety tests; Trooper Aragones did not require them. Trooper Aragones himself testified that when Evans reported past injuries in his knee and ankle, he did not ask Evans to perform the walk-and-turn or the one-leg test. Further, Evans did not refuse to recite the alphabet; instead, he explained that he could not

perform the test because of his dyslexia. Trooper Aragones testified that after he received that explanation, he then asked Evans to use the portable breath test. On cross-examination, Trooper Aragones admitted that the portable breath test was not an alternative field sobriety test. And, the trial court in its findings criticized Trooper Aragones for "not offer[ing] any other alternative tests to the SFSTs" and for not being able to "name the five alternate tests listed on the SFST scoring sheet if an injury was claimed." Thus, the trial court did not find Trooper Aragones's testimony about field sobriety tests to be credible, and we must defer to the factfinder.

Further, as noted, in our de novo review of the dash cam video, we find that Evans does not exhibit signs of intoxication. Thus, under the totality of circumstances in this case, we hold that Trooper Aragones did not have probable cause to arrest Evans for DWI. We therefore affirm the order of the trial court.

Karen Angelini, Justice

Publish