

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00435-CR

The **STATE** of Texas,
Appellant

v.

Jesus **SANCHEZ**,
Appellee

From the County Court at Law No 2, Webb County, Texas
Trial Court No. 2020CRB000444L2
Honorable Leticia Martinez, Judge Presiding

Opinion by:     Lori Massey Brissette, Justice

Sitting:        Lori I. Valenzuela, Justice
                Lori Massey Brissette, Justice
                H. Todd McCray, Justice

Delivered and Filed: September 10, 2025

REVERSED AND REMANDED

The State appeals the trial court's suppression of appellee Jesus Sanchez's blood test results after he was arrested for driving while intoxicated (DWI). The State argues the trial court erred by suppressing appellee Jesus Sanchez's blood test results because (1) the state trooper involved had reasonable suspicion to conduct a traffic stop, (2) the state trooper did not prolong Sanchez's detention, (3) the state trooper had probable cause to arrest Sanchez for DWI, and (4) Sanchez

freely and voluntarily consented to the blood test. Based on the law and the record, we reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

State Trooper Carlos Martinez of the Texas Department of Public Safety was patrolling Highway 359 when he noticed Sanchez's car was on the road with a defective license plate lamp. He stopped Sanchez's vehicle, informed Sanchez of the reason, and proceeded to investigate Sanchez's traffic violation by checking the vehicle's inspection sticker and VIN number. He testified that while checking the VIN number, he smelled alcohol coming from the vehicle and asked Sanchez if he had consumed any alcohol. Sanchez replied he did drink three beers, but he did not indicate when he drank them. Trooper Martinez then began to investigate Sanchez for DWI. *See* TEX. PENAL CODE § 49.04(a). After conducting the standard field sobriety tests, and believing he failed some of them, Trooper Martinez arrested Sanchez for DWI. After the arrest, Trooper Martinez repeatedly tested Sanchez's breath, with his consent, yielding results of 0.00. He then asked Sanchez, who was sitting handcuffed in the patrol unit, if he would be willing to submit to a blood test. Sanchez agreed. The results showed Sanchez tested positive for cocaine.

On April 4, 2024, Sanchez filed his motion to suppress which sought to suppress the results of the blood test as well as any statements made by him and any videos of him. During the May 7, 2024 hearing, the State called its only witness, Trooper Martinez. On June 13, 2024, the trial court granted in part the motion to suppress, suppressing only the blood test results. This appeal followed.

## MOTION TO SUPPRESS

The State contends the trial court erred when it suppressed Sanchez's blood test result. Specifically, it argues the trial court erred because Trooper Martinez: (1) had reasonable suspicion

to conduct Sanchez's traffic stop and did not subject Sanchez to a prolonged detention, (2) had probable cause to arrest him for DWI, and (3) Sanchez voluntarily consented to the blood draw.

## A. The Hearing and Video Evidence

During the motion to suppress hearing, Trooper Martinez testified that, on October 19, 2019 around 9:30 p.m., he began to follow Sanchez's pickup truck because he noticed Sanchez's license plate light was out as Sanchez passed his vehicle. As he approached Sanchez's vehicle in his patrol unit, Trooper Martinez positioned his patrol unit in the left lane—with Sanchez's vehicle in the right lane—so that the patrol unit's headlights would not illuminate the license plate of Sanchez's vehicle. This allowed Trooper Martinez to confirm the license plate lamp was not illuminated by the vehicle's license plate lights. He further testified that when he was approximately twenty feet from the back of Sanchez's vehicle, the license plate was still not clearly legible as required by Texas Transportation Code § 547.322(f). He then initiated a traffic stop.

After both vehicles pulled over to the side of the road for the traffic stop, Trooper Martinez approached Sanchez's vehicle on the passenger side. As he approached the vehicle, he reconfirmed one of the two license plate lamps was defective and not illuminated.[1] While he asked Sanchez for identification, Trooper Martinez also indicated he would give Sanchez a warning for the traffic violation. He testified that at that point he had no reason to suspect any other criminal activity. When Sanchez responded he did not have identification, Trooper Martinez asked Sanchez to step out of the vehicle so that he could identify him; Sanchez complied. Sanchez stood outside the passenger side of the vehicle while the trooper then approached the driver's side to check the registration to determine if the information matched the VIN number and the license plate number.

---

[1] He testified that once he had stopped Sanchez's vehicle, he parked his patrol unit directly behind it, and the video showed the patrol unit's headlights illuminating the back of Sanchez's pickup including the license plates.

Trooper Martinez testified he initially smelled alcohol while he was at the passenger door. But while he was walking back from the driver side where he was checking the VIN number, the driver's door window was down, and he smelled alcohol coming from inside the vehicle. He began looking for an open container or spilled alcohol in the vehicle. He then asked Sanchez if he had been drinking, and Sanchez responded he had consumed three twelve-ounce Bud Lights but did not state when he had done so. The Trooper then told Sanchez he could smell alcohol coming from his breath and from the vehicle and that he had confirmed the license plate number and the "sticker" on the vehicle did not match the VIN number. Sanchez replied that it was not his vehicle.

Trooper Martinez then conducted a standard field sobriety test involving Sanchez's eyes—the horizontal gaze nystagmus—which he testified Sanchez failed. He then asked Sanchez to do the walk and turn test, and Sanchez explained he could not do it, he was nervous, and "I'm not gonna pass." He then asked Sanchez to do the one leg stand test and then the hand pat test. Finally, Trooper Martinez asked Sanchez to do the finger count test, and the trooper testified he saw intoxication clues in the finger count test.

At the conclusion of the tests, and after a total of fourteen minutes, Trooper Martinez told Sanchez that based on the fact that he smelled like alcohol and failed the field sobriety tests, he was placing him under arrest for DWI. Sanchez fully cooperated and put his hands behind his back to be handcuffed. Trooper Martinez handcuffed him, read him his *Miranda* rights, searched him, and then placed him inside the front seat of the patrol unit.

Trooper Martinez then proceeded to pull up some records on his patrol unit terminal and had Sanchez listen to additional statutory warnings via an automated recording, providing Sanchez with a handout of the same to follow along. The recording provided that Sanchez would:

> be asked to give a specimen of breath and/or blood and the specimen will be analyzed to determine the alcohol concentration or the presence of a controlled

substance, drugs, or other substances in your body. If you refuse to give a specimen, that refusal may be admissible in a subsequent prosecution. Your license, permit, or privilege to operate a motor vehicle will be suspended or denied for not less than 180 days whether or not you are subsequently prosecuted for this offense. If you refuse to submit to the taking of a specimen, the officer may apply for a warrant authorizing the specimen to be taken from you. If you are twenty-one years of age or older and submit to the taking of a specimen, and the analysis of the specimen shows that you have an alcohol concentration of 0.08 or more, your license, permit, or privilege to operate a motor vehicle will be suspended or denied for not less than ninety days whether or not you are subsequently prosecuted for this offense. . . . However, if you submit to the taking of a specimen, and an analysis of the specimen shows you have an alcohol concentration of less than 0.08, you may be subject to criminal penalties . . . under Chapter 49, Penal Code. If you're operating a motor vehicle and refuse to give a specimen or provide a specimen that shows you have an alcohol concentration of 0.08 or more, you may be disqualified from driving a commercial motor vehicle for a period of less than one year. You may request a hearing on the suspension or denial . . . no later than fifteen days after you receive . . . notice of the suspension or denial. . . . I certify that I have been informed both orally and in writing the consequences of refusing to submit to the taking of a specimen or providing a specimen. I have provided you with a complete and true copy of the statutory warnings.

At this point, twenty-four minutes into the encounter, Trooper Martinez stated "Alright sir, at this time, I am asking you for a sample of your breath or blood. Would you be voluntarily providing one?" Sanchez replied, "yes, sir," without hesitation. After reviewing Sanchez's record on his computer, Trooper Martinez then went to Sanchez's vehicle, retrieved Sanchez's cell phone, searched the vehicle, and took photographs of it. After that, he drove Sanchez to the Laredo Police Department.

At the police station, Trooper Martinez administered two different breathalyzer tests on Sanchez. He administered the Intoxilyzer at approximately 10:27 p.m. At no time did Sanchez withdraw his consent. He further testified from 9:24 p.m. to 10:27 p.m. he had reasonable suspicion to believe Sanchez was intoxicated from alcohol. But the Intoxilyzer registered a 0.00. At this point in time Trooper Martinez and an additional trooper saw the results, and the additional trooper responded, "that's crazy." Trooper Martinez responded, "it is." After Trooper Martinez appeared to gather the Intoxilyzer paperwork, he then escorted Sanchez back to his patrol unit.

After Sanchez sat for ten minutes in the patrol unit in the parking lot, Trooper Martinez asked Sanchez to do a portable breath test; Sanchez readily agreed to do it. While Trooper Martinez prepared the portable breath test, he asked Sanchez if he was "doing any other type of drugs," and Sanchez replied "no, sir." He then asked Sanchez if he was diabetic, and Sanchez stated "yes, sir." Trooper Martinez asked Sanchez how long, and Sanchez replied "maybe" a year. Trooper Martinez then administered the portable breath test on Sanchez twice. After that, he asked Sanchez again if he had been doing any type of drugs, and Sanchez again stated, "no sir." Trooper Martinez then asked Sanchez again for his consent to do a blood test, and Sanchez again agreed without hesitation.

Trooper Martinez then transported him to the Laredo Medical Center. He testified that Sanchez, at this point, was not free to leave. But he further testified he did not believe Sanchez was forced to consent. Sanchez did not sign any consent forms that the Trooper could recall. Eventually, the trooper asked him if he would follow the nurse's orders for the blood draw, and Sanchez responded "yes, sir" without hesitation. Trooper Martinez then uncuffed Sanchez, and Sanchez sat there, uncuffed, with the door open in the room for the blood draw, for a few minutes until the nurse drew his blood. The blood draw took place at 11:08 p.m. Sanchez ultimately tested positive for cocaine, but the record does not reflect the amount of cocaine in his blood or give any indication of when Sanchez consumed it.

After the hearing, the trial court granted the motion to suppress in part, suppressing the blood draw, and it issued its findings of fact and conclusions of law thereafter.

## B. Standard of Review

We review the trial court's order granting Sanchez's motion to suppress the blood draw for an abuse of discretion. *See, e.g.*, *State v. McGuire*, 689 S.W.3d 596, 601 (Tex. Crim. App. 2024).

Within that review, we "[a]lmost complete[ly] defer[]" to the trial court's "determination of historical facts if supported by the record, especially when the factfinding is based on an evaluation of credibility and demeanor." *Monjaras v. State*, 664 S.W.3d 921, 926–27 (Tex. Crim. App. 2022). But, we review the trial court's legal rulings de novo, including its application of law to the facts of the case. *Monjaras*, 664 S.W.3d at 926–27; *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012).

During our review, we view the evidence in the light most favorable to the trial court's ruling and "assume that the trial court credited or discredited witness testimony in whatever way supports its decision." *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). But "if evidence is conclusive, such as indisputable video evidence, we may disregard any trial court findings inconsistent with the conclusive evidence," *Monjaras*, 664 S.W.3d at 926. "The winning side is afforded the 'strongest legitimate view of the evidence' as well as all reasonable inferences that can be derived from it." *State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013) (quoting *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011)). And if a trial court omits certain findings of fact, we assume the judge made implicit findings of fact that support the ruling "as long as those findings are supported by the record." *See Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006).

## C. Findings of Fact and Conclusions of Law

Here, the trial court's pertinent findings of fact and conclusions of law provide:

4. Defendant Jesus Sanchez passed the Trooper's patrol vehicle and Trooper noticed the license plate was not illuminated in accordance with the Texas Transportation Code and unable to see the license plate.

5. Trooper positioned his unit on the left lane behind the Defendant's vehicle and he was still not able to read the plate and decided to pull the vehicle.

 . . . .

10. After the Defendant was unable to provide any identification, the Trooper moved to driver's side window and at that point smelled alcohol emitting from the car. Prior to this point the Trooper did not have any articulable suspicion of any illegal activity. He testified that his intent was to give him a warning.

. . . .

12. Body Cam footage showed Defendant cooperating with the Trooper during the whole interchange and responding to questions. The Trooper further testified that the Defendant was driving normal and not acting nervous. The only articulable fact testified to by the Trooper was that he smelled alcohol coming from the car.

13. Defendant admitted to drinking 2-3 regular beers during the day but there were no questions as to when during the day he consumed said alcohol.

14. The Trooper administered field sobriety tests which in the opinion of the Trooper the Defendant failed. The Trooper arrested the Defendant, handcuffed him, read him his rights and placed him in his unit. The body camera footage presented showed the Defendant to be an older man and overweight and the Court believed Defendant's statements that he is diabetic and has trouble with his knees and balance. The court believed that this was the reason why Defendant did not perform well during some of the field sobriety tests.

15. Defendant was pulled over at 9:24 p.m. and taken to The Police Department at 10:12 p.m.

16. The breathalyzer was administered at approximately 10:27 p.m. at the Laredo Police Department and results yielded 0 for the presence of alcohol.

17. Without any basis or articulable facts, the Trooper decided to take him to the hospital for a blood sample.

18. Defendant was handcuffed, in the patrol unit and not free to leave when the Trooper asked him to agree to a blood draw. This Court did not accept the verbal consent as it was not voluntary and given under duress.

19. The blood consent form was not signed and none was produced or found.

20. There was no search warrant to draw Defendant's blood.

21. At approximately 11:00 p.m. the blood was drawn, approximately 2 hours from the initial stop.

22. Days later the blood drawn showed positive for cocaine but negative for alcohol.

23. The level of cocaine was not shown, only that it was positive.

24. The reason for the stop was for a violation of Tx Trans Code 547.322.25.

25. The body cam footage did show the plate to be illuminated but the Trooper testified that it could have been his patrol units' lights.

26. The Court does find that the detention was too long in duration.

27. The Trooper may have had reasonable suspicion for alcohol but there was no reasonable suspicion of any other illegal activity nor any other fact articulated.

28. The Trooper's investigation should have ended after the breathalyzer yielded a 0 result for alcohol.

29. There was no probable cause nor reasonable suspicion to warrant further investigations after Defendant's breath test.

30. The blood draw was unreasonable and unwarranted.

### D. Reasonable Suspicion for Detention

The State contends the trial court erred by suppressing Sanchez's blood draw because Sanchez's traffic stop was proper and because Trooper Martinez did not subject Sanchez to a prolonged detention. Specifically, the State asserts that, while Sanchez was initially detained for a traffic violation, once Trooper Martinez developed reasonable suspicion that Sanchez had been driving while intoxicated, he had reason to continue the investigation. We agree.

The trial court's specific findings pertaining to reasonable suspicion during Sanchez's detention include that Sanchez: (1) was driving normally and not acting nervous, (2) admitted he drank three beers at some unspecified time earlier that day, and (3) his physical condition impacted the results of *some, but not all* of the field sobriety tests. The trial court's findings are supported by the evidence or not otherwise contradicted by indisputable video evidence. *See Monjaras*, 664 S.W.3d at 926. Specifically, the trial court found that Sanchez's knees, trouble with balance, and diabetes were the reason he did not perform well during *some* of the field sobriety tests, referring to the walk and turn test and the one leg stand test. The trial court did not find that his physical condition impacted the results of the horizontal gaze nystagmus test, the hand pat test, and the finger count test. Notably, Trooper Martinez found Sanchez failed only the horizontal gaze nystagmus and the finger count test.

#### 1. Law

"Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion." *Derichsweiler v.*

*State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011); *see, e.g.*, *State v. Evans*, 500 S.W.3d 528, 537 (Tex. App.—San Antonio 2016, no pet.).[2] Any investigation pursuant to a detention must be reasonably related to the original purpose of the detention "and may not be prolonged beyond the time to complete the tasks associated" with it. *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). A police officer's investigation accompanying the detention may include the ordinary inquiries such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the vehicle's registration, and proof of insurance. *Id.* at 193. A police officer may ask a suspect "about matters unrelated" to the original purpose of the detention, but "any questioning cannot measurably extend the duration" of the detention. *See State v. Dominguez*, 714 S.W.3d 42, 48 (Tex. App.—El Paso 2022, pet. ref'd) (citing *Lerma*, 543 S.W.3d at 190). But if, based on this questioning, a police officer "develops reasonable suspicion" of criminal activity, the officer may continue questioning "to confirm or dispel their suspicions of other crime quickly, so long as they do not unnecessarily detain" a suspect.[3] *Lerma*, 543 S.W.3d at 195; *Martinez*, 638 S.W.3d at 750 (citing *Lambeth v. State*, 221 S.W.3d 831, 836 (Tex. App.—Fort Worth 2007, pet. ref'd)). When determining the lawfulness of a detention we "must first decide whether the officer's action was justified at its inception." *Lerma*, 543 S.W.3d at 190. The central "inquiry is whether the information upon which probable cause or reasonable suspicion exists was obtained before the tasks related to the . . . original . . . purpose were completed." *Id.*

---

[2] "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Derichsweiler*, 348 S.W.3d at 914; *see, e.g.*, *Evans*, 500 S.W.3d at 537. "This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was objectively justifiable basis for the detention." *Derichsweiler*, 348 S.W.3d at 914; *see, e.g.*, *Evans*, 500 S.W.3d at 537. "It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Derichsweiler*, 348 S.W.3d at 914; *see, e.g.*, *Evans*, 500 S.W.3d at 537.

[3] The law provides "no rigid time frame or bright-line rule that governs the acceptable duration of a temporary detention." *State v. Martinez*, 638 S.W.3d 740, 750 (Tex. App.—Eastland 2021, no pet.).

Here, Sanchez was originally detained for a traffic violation but then arrested for driving while intoxicated. A person commits the offense of driving while intoxicated and is subject to a lawful arrest if he "is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE § 49.04(a). "Intoxicated" means "not having the normal use of mental or physical faculties by reason of the introduction of alcohol [or] a controlled substance" or "having an alcohol concentration of 0.08 or more." *Id.* § 49.01(2)(A). Mindful of our standard of review, we must therefore determine, first, whether the original traffic stop was proper and, second, whether under the totality of the circumstances Trooper Martinez obtained reasonable suspicion that Sanchez was driving while intoxicated before he concluded the tasks related to the traffic stop.

### 2. Discussion

Here, the trial court found Trooper Martinez stopped Sanchez for a traffic violation and indicated he would give Sanchez a warning for the traffic infraction. Thereafter, he completed the ordinary inquiries and routine tasks associated with the traffic stop like checking the vehicle's VIN number against the registration and asking Sanchez for his license. *See Lerma*, 543 S.W.3d at 193. The stop was therefore lawful at its inception. *See Lerma*, 543 S.W.3d at 190. During this timeframe, and while he lawfully conducted the normal routines incident to his investigation, he smelled alcohol. He then asked Sanchez if he had been drinking, which did not measurably extend the duration of the detention. *See Dominguez*, 714 S.W.3d at 48; *Lerma*, 543 S.W.3d at 190. Sanchez indicated he had had three beers, giving the trooper reasonable suspicion of some other criminal activity that would justify continuing the detention beyond the broken license plate lamp. *See Dominguez*, 714 S.W.3d at 48. This is consistent with the trial court's findings.

But because Trooper Martinez now had reasonable suspicion, he was permitted to continue the detention to investigate Sanchez for DWI to confirm or dispel his suspicions. *Lerma*, 543

S.W.3d at 195. Trooper Martinez did exactly that. First, he had Sanchez provide his personal information so he could identify him. He then subjected him to field sobriety tests in furtherance of his investigation. *See Dominguez*, 714 S.W.3d at 48. At the conclusion of the tests, Trooper Martinez told Sanchez he was under arrest based on the odor of alcohol, his admission to drinking, and his failure of the field sobriety tests. The entire time from the odor of alcohol to the arrest was approximately thirteen minutes—comprised largely of the field sobriety tests. The indisputable video evidence shows Trooper Martinez was strictly focused on his investigation until he arrested Sanchez.

### E. Probable Cause for Arrest

The State further contends the trial court erred by suppressing Sanchez's blood draw because Trooper Martinez lawfully arrested Sanchez upon probable cause for DWI. We agree. If, as here, a detention escalates into a warrantless arrest, such an arrest "is reasonable if the officer has probable cause." *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). The burden is on the State to establish reasonableness. *Martinez v. State*, 620 S.W.3d 734, 740–41 (Tex. Crim. App. 2021). "Whether probable cause existed is a mixed question of law and fact that does not turn on credibility and demeanor." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). "On appeal, a finding of probable cause is reviewed de novo." *Id.*

Probable cause "is a commonsense, nontechnical concept that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)) (cleaned up). It "exists if, at the moment the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an

offense." *Amador*, 275 S.W.3d at 878; *Martinez*, 620 S.W.3d at 740 (providing probable cause requires more than bare suspicion but less than what would be needed for conviction).

The trial court found Sanchez was operating a motor vehicle in a public place, this is undisputed and supported by the evidence. *See* TEX. PENAL CODE § 49.04(a). The only question then, is whether, at the moment the arrest is made, the facts and circumstances within Trooper Martinez's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent man in believing that Sanchez (1) did not have the normal use of mental or physical faculties by reason of the introduction of alcohol *or* (2) had an alcohol concentration of 0.08 or more. *See* TEX. PENAL CODE § 49.04(a); *Amador*, 275 S.W.3d at 878. The trial court found Trooper Martinez had the following facts at his disposal at the time of the arrest: (1) Sanchez was driving normally and not acting nervous; (2) Sanchez admitted he drank beers at some unspecified time earlier that day; and (3) Sanchez failed the field sobriety tests involving his knees and balance because of his physical ailments, but his physical condition did not affect his performance on the other field sobriety tests, including the horizontal gaze nystagmus test and the finger count test, both of which Trooper Martinez believed he failed.

Evidence supporting a DWI includes, among other things, an odor of alcohol, an inability to perform field sobriety tests or follow directions, as well as an admission of what, when, and how much a suspect has been drinking. *See, e.g.*, *Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010); *Zill v. State*, 355 S.W.3d 778, 785 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Murray v. State*, 457 S.W.3d 446, 449 (Tex. Crim. App. 2015) (concluding evidence legally sufficient to support DWI despite no specific evidence as to when defendant became intoxicated because, among other things, defendant failed field sobriety tests). *See generally Finley v. State*, 809 S.W.2d 909, 913 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd) ("Texas courts

consistently uphold DWI convictions based upon the opinion testimony of police officers who observed the defendant's unsatisfactory performance in field sobriety tests.").

Here, mindful of our standard of review, Trooper Martinez had probable cause to arrest Sanchez for DWI based on Sanchez not having the normal use of mental or physical faculties by reason of the introduction of alcohol. *See* TEX. PENAL CODE § 49.04(a); *Amador*, 275 S.W.3d at 878. The findings show Sanchez had an odor of alcohol, and Sanchez admitted drinking three beers that day. Moreover, Sanchez failed two field sobriety tests. *See Murray*, 457 S.W.3d at 449; *Kirsch*, 306 S.W.3d at 745; *Zill*, 355 S.W.3d at 785; *Finley*, 809 S.W.2d at 913.

## F. Consent to Blood Draw

Finally, the State contends the trial court erred in suppressing the blood sample because Sanchez provided voluntary consent for the blood draw. Securing a blood sample from a suspect is a form of search under both the United States and Texas Constitutions. U.S. CONST. amend. IV; Tex. Const. art. I, § 9; *State v. Mosely*, 348 S.W.3d 435, 442–43 (Tex. App.—Austin 2011, pet. ref'd). "In general, to comply with the Fourth Amendment, a search of a person pursuant to a criminal investigation (1) requires a search warrant or a recognized exception to the warrant requirement, and (2) must be reasonable under the totality of the circumstances." *State v. Villarreal*, 475 S.W.3d 784, 795–810 (Tex Crim App 2014).[4] It is undisputed that this was a warrantless search. "One of th[e] exceptions [to the warrant requirement] is a search conducted with the person's voluntary consent." *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011). *See generally Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973).

---

[4] In *Villarrreal*, the Court of Criminal Appeals clarified that a blood draw does not constitute a search incident to an arrest. *See Villarreal*, 475 S.W.3d at 807 ("With respect to the suggestion that a warrantless blood draw constitutes a search incident to arrest, we also reject that contention . . . .").

The validity of a person's consent to search is a question of fact to be determined based on the totality of the circumstances. *Meekins*, 340 S.W.3d at 458; *see, e.g.*, *Villarreal*, 475 S.W.3d at 799. The State must prove the consent was freely and voluntarily given by clear and convincing evidence. *State v. Ruiz*, 581 S.W.3d 782, 786 (Tex. Crim. App. 2019); *see Meekins*, 340 S.W.3d at 459. Voluntary consent "means more than a knowing choice." *Meekins*, 340 S.W.3d at 458. It may not be coerced, by explicit or implicit means, by implied threat of force, or by the use of covert force, "physical mistreatment, . . . promises or inducements, [and] deception or trickery". *See id.* at 459. But "[n]o one statement or action automatically should amount to coercion such that consent is involuntary—any statement or action must be considered in the totality of the circumstances." *Doremus v. State*, 530 S.W.3d 277, 283 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Other "[r]elevant considerations include the subject's sophistication in the law, mental acuity, and ability to exercise a free choice when facing arrest, and whether he was advised of his [*Miranda*] rights . . . , or advised that the results of the search could be used against him." *Ruiz*, 581 S.W.3d at 786. Further, "[a] defendant may limit the scope of his consent or revoke it altogether." *Id.* (citation omitted).

The ultimate question is whether, based on the totality of the circumstances, "the person's will has been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been involuntary." *Doremus*, 530 S.W.3d at 283 (quoting *Meekins*, 340 S.W.3d at 459) (internal quotation marks omitted). Because issues of consent are necessarily fact intensive, a trial court's finding of involuntariness "must be accepted on appeal unless it is clearly erroneous." *Meekins*, 340 S.W.3d at 460 (providing evidence clearly erroneous if appellate court is left with definite and firm conviction trial court's findings are not supported by evidence).

We may disregard a trial court's findings only when we have a definite and firm conviction the trial court's findings are not supported by the evidence. *See id.*; *Monjaras*, 664 S.W.3d at 926.

Here, the trial court found that Sanchez only consented "under duress" after he passed his breath tests with a 0.00, and was handcuffed, in the patrol unit, and not free to leave. But the indisputable video evidence shows Sanchez consented far earlier than his consent after the breath tests. In fact, he consented minutes after Trooper Martinez arrested him for DWI. Immediately after Sanchez was arrested, he was put in handcuffs and assisted into the front seat of the patrol unit. Trooper Martinez then played an automated recording for Sanchez providing him with some additional statutory warnings and gave him a handout of the same to follow along. The statutory warnings provided, among other things, Sanchez was being asked for a breath and/or blood draw in order to determine whether he was driving while intoxicated. It further provided: (1) such refusal may be admissible in court, (2) the trooper could then seek a warrant for a blood draw, (3) his license could be suspended, and (4) the consequences of a positive blood draw. The record also explained Sanchez could appeal any suspension of his license, and that he was being provided a copy of the warnings, among other things. The Trooper then asked Sanchez if he was willing to "voluntarily" provide "a sample of [his] breath or blood." He replied, "yes, sir," without hesitation.

Trooper Martinez's body cam shows he never coerced Sanchez, explicitly or implicitly, or otherwise made an implied threat of force or used any force. *See Meekins*, 340 S.W.3d at 459. He never physically mistreated, threatened, or tricked Sanchez. *See id.* at 460 n.26. In fact, the interaction between Trooper Martinez and Sanchez was calm, nonconfrontational, and even fairly relaxed throughout. It goes without saying that Trooper Martinez never drew his weapon. And at no time did Sanchez seem afraid of Trooper Martinez. Instead, he seemed relatively calm throughout the encounter. Indeed, Sanchez was so comfortable with Trooper Martinez that when

the trooper asked him to perform the one leg balance test, Sanchez refused, explaining he could not do it because he knew he would fail it.

Sanchez always answered Trooper Martinez's questions directly, recounted his whereabouts for Trooper Martinez, and filled out his name and address for Trooper Martinez to identify him as a part of his investigation. Further, he was advised of his *Miranda* rights, his statutory warnings related to a DWI arrest, and voluntarily consented without hesitation after being asked (not told) by Trooper Martinez. *See Ruiz*, 581 S.W.3d at 786; *see also Torres v. State*, 482 S.W.3d 629, 636 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (valid consent to search may be oral).

And at no time did Sanchez revoke his consent. *See Ruiz*, 581 S.W.3d at 786. Nor did Trooper Martinez mislead him about whether he had to consent or otherwise misstate the law. *See Ruiz*, 581 S.W.3d at 786; *see also State v. Mosely*, 348 S.W.3d 435, 442–43 (Tex. App.—Austin 2011, pet. ref'd) (overruling state's contention that trial court erroneously found voluntary consent where officer, among other things, misstated law).

It is true Sanchez was handcuffed, in the patrol unit, and not free to leave when the trooper asked him to agree to a blood draw. *See Meekins*, 340 S.W.3d at 464. But a person may still voluntarily consent when in handcuffs and placed in a patrol unit—even after being arrested. *See, e.g., Johnson v. State*, 68 S.W.3d 644, 653 (Tex. Crim. App. 2002) (consent not rendered involuntary merely because accused is under arrest). The ultimate rule of voluntary consent is whether a person's will is overborne, and it is examined based on the totality of the circumstances. *See Doremus*, 530 S.W.3d at 283 ("But no one statement or action automatically renders consent is involuntary—any statement or action must be considered in the totality of the circumstances."). While Sanchez was handcuffed in the patrol unit, he was in the *front* passenger seat, within a few

feet of Trooper Martinez the entire time—not in the caged rear of the patrol unit. And the trial court's findings, supported by the evidence, show Sanchez was read his *Miranda* rights within the first fifteen minutes of his encounter with Trooper Martinez and then provided statutory warnings specific to a DWI arrest. Even when he was transported to the hospital and while waiting twenty minutes for the blood draw, Sanchez never withdrew his consent or expressed any hesitation of any kind.

In other words, the totality of the circumstances show Sanchez's will was not overborne when he consented to a blood draw shortly after he was arrested for DWI and again later in the encounter, and his capacity for self-determination had not been critically impaired, rendering his consent involuntary. *See Meekins*, 340 S.W.3d at 459; *Doremus*, 530 S.W.3d at 283. The trial court's finding that Sanchez's consent was involuntary is therefore not supported by the evidence and is clearly erroneous.

Because the trial court's finding that Sanchez did not consent is clearly erroneous, the trial court abused its discretion when it suppressed the results of the blood draw.

## CONCLUSION

Accordingly, we reverse the trial court's June 13, 2024 order to the extent it granted the motion to suppress the blood test results and remand for further proceedings consistent with this opinion.

Lori Massey Brissette, Justice

DO NOT PUBLISH